751 P.2d 519

The ARIZONA PROPERTY & CASUAL-
TY INSURANCE GUARANTY FUND, a
subdivision of the Department of Insur-
ance of the State of Arizona, Plaintiff–
Appellant,

v.

Charles M. HERDER,
Defendant–Appellee.

No. CV–87–0081–PR.

Supreme Court of Arizona,
En Banc.

Feb. 25, 1988.

Holloway & Thomas, P.C. by Benjamin C. Thomas and Jennings, Kepner & Haug by Randy L. Sassaman, Phoenix, for plaintiff-appellant.

G. David Gage, Ltd. by G. David Gage, Phoenix, for defendant-appellee.

FELDMAN, Vice Chief Justice.

Petitioner, Charles Herder (Herder), seeks review of a court of appeals' opinion holding that, under A.R.S. § 20–673, Herder's recovery from his host driver's insurance carrier effectively offset and reduced the limits of coverage provided by cross-petitioner, the Arizona Property & Casualty Insurance Guaranty Fund (Fund). We granted review to examine and interpret the statute. Rule 23, Ariz.R.Civ.App.P., 17A A.R.S. We have jurisdiction under Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

## STATEMENT OF FACTS

The operative facts are undisputed. Herder was a passenger in an automobile owned and driven by Michael Dubois when it was hit by an uninsured motorist. Apparently the accident was due entirely to the negligence of the uninsured motorist. The parties stipulated that Herder's damages exceeded $30,000.

At the time of the accident, Herder was covered by Dubois's uninsured motorist coverage from State Farm Insurance Company. Herder also had uninsured motorist coverage on his own policy with Ambassador Insurance Company. Both policies had limits of $15,000 per person.

Herder recovered $15,000 from State Farm under Dubois's policy. Because his damages exceeded this recovery, he then filed a claim with Ambassador for the $15,000 limit available under his own uninsured motorist coverage. Ambassador subsequently became insolvent and was placed in receivership. Pursuant to A.R.S. § 20–661 et seq., it was succeeded by the Fund, which was established by statute to assume the liability of insolvent insurers. See Arizona Property & Casualty Insurance Guaranty Fund v. Helme, 153 Ariz. 129, 735 P.2d 451 (1987).

The Fund brought an action for declaratory relief against Herder, arguing that it had no obligation to pay Herder's claim because, under the terms of the Ambassador policy, the $15,000 uninsured motorist coverage was reduced by the $15,000 Herder recovered from State Farm. Alternatively, the Fund argued that even if Ambassador was liable to Herder for $15,000, A.R.S. § 20–673(C) extinguished the Fund's liability.

The trial court granted summary judgment for Herder, and the Fund appealed. In reversing, the court of appeals held that Ambassador would have been obligated to pay Herder $15,000 under its policy, but also held that the obligation did not continue when it was assumed by the Fund. Rather, § 20–673(C) required that the $15,000 limit otherwise available from the Fund be reduced by the $15,000 recovery from State Farm. Arizona Property & Casualty Guaranty Fund v. Herder, 1 CA–CIV 8697 (Ariz.Ct.App. Sept. 9, 1986) (Memorandum Decision).

On Herder's petition and the Fund's cross-petition, we accepted the following issues for review:

1. Does A.R.S. § 20–673(C) operate as a statutory "other insurance"-escape clause to prevent Herder's recovery from the Fund of amounts he would otherwise be entitled to recover under Ambassador's "other insurance"-excess clause?

2. Was A.R.S. § 20–673(C) repealed by implication as it relates to uninsured/underinsured coverage by the 1981–82 amendments to A.R.S. § 20–259.01?

3. Does the Ambassador policy effectively state an escape clause?

4. If so, is the clause enforceable?

Our resolution of issues 1 and 3 is dispositive.

### THE FUND'S STATUTORY OFFSET

■ The resolution of this case primarily depends upon the meaning of A.R.S. § 20–673(C), which is the functional equivalent of an "other insurance" clause. Such clauses are intended to reduce an insurer's liability and prevent double recovery by an insured when there is another policy covering the same loss. *State Farm Mutual Automobile Insurance Co. v. Bogart*, 149 Ariz. 145, 717 P.2d 449 (1986).

Subsection (C) of the statute reads as follows:

> Where more than one policy may be applicable, a policy issued by the insolvent insurer shall be deemed to be excess coverage. The claimant shall be required to exhaust all rights under other applicable coverage or coverages. Any *amount payable* on a covered claim *shall be reduced* by the amount of such recovery under other applicable insurance.

(Emphasis added.)

The Fund construes the language of the third sentence as effectively requiring that the *limits available* on the insurance provided by the Fund, as successor to Ambassador, be reduced by the amount recovered from State Farm. Because both policies had limits of $15,000, State Farm's payment would accordingly reduce the limits of the Ambassador policy to zero, with the Fund providing no coverage at all. The court of appeals agreed with the Fund's construction, relying entirely upon its previous holding in *Arizona Property & Casualty Insurance Guaranty Fund v. Ueki*, 150 Ariz. 451, 724 P.2d 70 (App.1986). Review was not sought in *Ueki.* We believe

that *Ueki* interpreted the statute incorrectly.

### 1. *The Text and Legislative Intent of the Statute*

We note at the outset that the statute does not provide for any offset or reduction in *limits* payable. Language accomplishing the interpretation advanced by the Fund and adopted in *Ueki* is commonly used in the industry.[1] It is easy to understand why the legislature would not choose such a provision: it creates harsh results in the many instances involving automobile insurance where limit-against-limit offset produces a complete escape for the excess carrier. 1 A. WIDISS, UNINSURED AND UNDERINSURED MOTORIST INSURANCE § 13.3, at 387–88 (2d ed. 1987). In light of this reality, many courts have refused to enforce such provisions in "other insurance" clauses, deeming them contrary to the legislative objectives expressed in various statutes, including financial responsibility and uninsured motorist laws. *Id.* § 13.6, at 397–402. The fact that our legislature did not use the word "limit" in the provision requiring offset of the claimant's recovery from the other insurer militates against the construction adopted in *Ueki.*

The legislative scheme generally provides that the Fund shall be "deemed the insurer" and have all the "rights" as well as all the "obligations of the insolvent insurer." A.R.S. § 20–667(C).[2] In general, the legislative objective was to make the Fund liable to the same extent that the insolvent insurer would have been liable under its policy.[3] *Treffenger v. Arizona*

---

1. NATIONAL BUREAU OF CASUALTY UNDERWRITERS, 1966 STANDARD UNINSURED MOTORIST INSURANCE FORM, Part VI(E): Additional Conditions—Other Insurance, *reprinted in* 1 A. WIDISS, UNINSURED AND UNDERINSURED MOTORIST INSURANCE, App. A at 19 (2d ed. 1987), provides:

 [T]his insurance shall ... apply only in the amount by which the limit of liability for this coverage exceeds the applicable limit of liability of such other insurance.

2. Escape by offset of limits was not one of the rights enjoyed by Ambassador under either the terms of its "other insurance" clause or the general law of this state. *See Bogart.*

3. This said, we nevertheless reject Herder's suggestion that the rights and obligations of the insolvent insurer and the Fund are absolutely coextensive. In two critical areas, A.R.S. § 20–667 limits the Fund's obligations without regard to what the insolvent insurer's obligations may have been. Subsection (A) limits the period during which claims must arise to be covered. Subsection (B) limits the Fund's obligation to the face amount of the insolvent insurer's policy or $100,000, whichever is less. Herder's construction of § 20–667(C) would also render inoperable other provisions of the statutory scheme defining the Fund's rights. *See, e.g.,* A.R.S. § 20–676 (allowing the Fund to obtain a

*Insurance Guaranty Association,* 22 Ariz. App. 153, 524 P.2d 1326 (1974). Given this objective, and an understanding of "other insurance" clauses, we believe that A.R.S. § 20–673(C) can be interpreted to give each part a meaning that furthers the legislative purpose.

## 2. *"Other Insurance" Clauses*

There are three types of "other insurance" provisions: prorata or sharing clauses, excess clauses, and escape clauses. *Bogart,* 149 Ariz. at 147, 717 P.2d at 451 (citing Comment, *Double Insurance Coverage in Automobile Insurance Policies— The Problem of "Other Insurance" Clauses,* 47 TUL.L.REV. 1039 (1973)); 8A J.A. APPLEMAN & J. APPLEMAN, INSURANCE LAW AND PRACTICE § 4906, at 345–52 (1981).

■ A prorata provision in an "other insurance" clause requires both insurers to prorate the loss, usually in proportion to the limits each policy bears to the total available limits. *Bogart,* 149 Ariz. at 147, 717 P.2d at 451; 8A APPLEMAN, *supra* § 4908. If such a provision were applied to the two policies here, which have equal limits, any loss would be divided equally between State Farm and Ambassador, though, of course, neither would pay more than the limits of its respective policy. Thus, under a prorata clause, if Herder's loss were $10,000, State Farm and Ambassador would each be responsible to pay $5,000. If the loss were $30,000 or above, each would pay its $15,000 limit.

■ An excess coverage provision in an "other insurance" clause provides that the policy will cover a loss only after the limits of the other (primary) policy covering the same risk have been exhausted. *Bogart,* 149 Ariz. at 147, 717 P.2d at 451; 8 P.

KELLY, BLASHFIELD, AUTOMOBILE LAW AND PRACTICE § 323.11, at 262–63 (3d ed. 1987); 8A APPLEMAN, *supra* § 4909. Under an excess provision, if Herder's loss were $10,000, State Farm, the primary carrier, would pay it all and Ambassador would pay nothing. If the loss were $20,000, State Farm would pay $15,000 and Ambassador $5,000. Of course, if the loss were $30,000 or more, State Farm would pay the first $15,000 and Ambassador, as excess carrier, would pay the next $15,000.[4]

■ Escape-type "other insurance" provisions have a contrary effect; they allow an insurer to escape liability altogether. In effect, an escape-type provision states that if there is other insurance, the insurance afforded by "this policy" shall not apply at all.[5] *Bogart,* 149 Ariz. at 147, 717 P.2d at 451; 8A APPLEMAN, *supra* § 4910. Of course, a limit-against-limit reduction provides a full escape when, as in this case, the limits of the two policies are the same, and provides a partial escape when the limits of the second policy exceed those of the first. Thus, in this case where Ambassador's policy contained an excess clause, if State Farm's had contained an escape clause and Herder's loss were $10,000, Ambassador would be responsible for the entire loss. If Herder's loss were $30,000, Ambassador would be responsible for its full $15,000 limit. State Farm would totally escape liability, providing its escape clause was invoked and enforced.

## 3. *Resolution*

The clear meaning of the first sentence of subsection (C) is that where "other insurance" applies to the same risk covered by the insolvent insurer, the latter's cover-

stay in any proceedings pending against the insolvent insurer and to set aside a judgment upon which a covered claim is based). Thus we conclude, as the *Ueki* court did, that the Fund is deemed the insurer to the extent of the Fund's obligation on the covered claims, and not to the extent of the insolvent insurer's. 150 Ariz. at 455, 724 P.2d at 74.

**4.** If both the State Farm and Ambassador policies had contained excess "other insurance" provisions, the clauses would have been mutually

repugnant. The usual result in such cases is to prorate the loss between the carriers as if each policy contained prorata clauses. 8A APPLEMAN, *supra* § 4909, at 395–408.

**5.** A typical escape clause reads:
The insurance does not apply: ... to any liability for such loss as is covered on a primary, contributory, excess or any other basis by insurance in another insurance company. 8a APPLEMAN, *supra* § 4906, at 349.

age "shall be deemed to be excess coverage." Presumably to protect the Fund, the first sentence of subsection (C) thus gives the Fund the benefit of a statutorily created excess-type "other insurance" clause. Regardless of the provisions in either insurer's policy, the Fund will be excess and the other insurer primary.[6]

The second sentence of subsection (C) requires that the claimant "exhaust all rights under [the] other applicable coverage." Obviously, this effectuates the statute's excess coverage provision by directing the claimant to exhaust all rights under the primary coverage before requiring the Fund to pay any part of the loss under its excess coverage. Herder satisfied this requirement when he obtained payment of the coverage limits from the primary carrier, State Farm.

Given the plain meaning of the first two sentences of subsection (C), we believe that the interpretation given the third sentence in *Ueki* is incorrect. *Ueki* held that the claimant's recovery from the primary insurer effectively is to be applied to reduce the coverage on the insolvent insurer's policy rather than to reduce the amount payable on the total damage claim. 150 Ariz. at 454, 724 P.2d at 73. We disagree with this view. *Ueki*'s interpretation would transform the third sentence into a statutory escape clause, destroying the excess provision which the first sentence created. In the case before us, it would offset Herder's $15,000 recovery from State Farm against the $15,000 *limit* of the Fund's excess coverage, reducing the limits of the excess coverage to zero. The victim would receive nothing from the Fund on account of the liability of the insolvent carrier, a result directly opposed to the first sentence of § 20-673(C) and to the intent the legislature expressed in A.R.S. § 20-667(C). *See Helme*, 153 Ariz. at 132, 735 P.2d at 454;

*Treffenger*, 22 Ariz.App. at 154, 524 P.2d at 1327.

Such an interpretation would allow the last sentence of subsection (C) to swallow whole the first, rendering it meaningless by eliminating excess coverage except in those cases where the limits of the excess coverage exceed the limits of primary coverage. *See Ueki*, 150 Ariz. at 455, 724 P.2d at 74. In automobile insurance, most accidents occur between residents of the same state where, because of financial responsibility laws, the great majority of people have the same coverage limits. 1 A. WIDISS, *supra* § 13.3, at 387. The result would be that in most automobile cases involving "other insurance," the Fund would not provide excess coverage but would provide no coverage at all. A statute that expressly provides for excess coverage in cases of "other insurance" would be interpreted to apply as if it provided a partial escape clause.

Admittedly, the last sentence of subsection (C) is neither a model of clarity nor an exemplar of the draftsman's craft. We believe, however, that it can be given a reasonable construction. That sentence does require an offset ("shall be reduced"), but not an offset against limits. Rather, it provides for an offset of the amount recovered from the primary carrier against the total "amount payable" to the claimant as damages. Thus, the sentence, "Any amount payable on a covered claim[7] shall be reduced by the amount of such recovery under other applicable insurance," means simply that the total amount payable as damages for the claimant's injuries caused by the covered occurrence shall be reduced by the amount the claimant has recovered from the primary carrier. This construction furthers the statutory purpose of preventing duplication in damage payments to

---

**6.** The importance of this can be seen in cases in which the insolvent insurer has a prorata-type provision and the other insurer has an escape-type provision. In such cases, subsection (C) makes the other insurer the primary carrier, notwithstanding its escape provision, and the Fund the excess carrier, even though the combined effect of the two clauses would have been to make the insolvent insurer the primary carri-

er if insolvency had not occurred. *See* 8A APPLEMAN, *supra* § 4909.25, at 409.

**7.** A "'covered claim' is 'an unpaid claim ... which arises out of and is within the coverage of an insurance policy' issued by an insolvent insurer." *Helme*, 153 Ariz. at 132, 735 P.2d at 454 (quoting A.R.S. § 20-661(3)).

the claimant and preventing the claimant from attempting to invoke the collateral source rule. *See Bogart*, 149 Ariz. at 147, 717 P.2d at 451.

■ Applied to the facts of the case before us, under the first sentence of subsection (C), no matter what the nature of the respective "other insurance" clauses, State Farm would be considered the primary carrier and the Fund the pure excess carrier. Under the second sentence, Herder would be required to exhaust his rights under the State Farm coverage. Under the third, the proceeds of Herder's recovery from State Farm would reduce the total damages payable. Thus, if the total damages sustained by Herder had been $10,000, State Farm would pay all. If they had been $20,000, Herder would have to recover $15,000 from State Farm, and the amount owed by the Fund would be reduced to $5,000. Where, as here, the loss exceeds the primary carrier's limits, the Fund, as excess carrier, pays the excess up to the limits of its coverage. By statute, its coverage is the limit of the insolvent insurer's policy or $100,000, whichever is less. A.R.S. § 20–667(B).

We hold, therefore, that Herder's $15,000 recovery from State Farm reduces the amount of his damage claim. Because his total damages exceeded $15,000, he may recover the remaining damages from the Fund, up to the limits of its coverage.

## LIABILITY UNDER THE AMBASSADOR POLICY

As noted above, the Fund does not cover a claim unless the insolvent insurer would have provided coverage. The Fund argues that it has no liability to Herder because he had no claim under the Ambassador policy. That policy's limit-of-liability clause provided:

> Any amounts otherwise payable for damages under this coverage shall be reduced by all sums:
> 1. Paid because of the bodily injury by or on behalf of persons or organizations who may be *legally responsible*.

(Emphasis added.) The Fund maintains that this clause reduced Ambassador's $15,000 liability by the $15,000 paid by State Farm. It reaches this conclusion by reasoning that State Farm was an organization "legally responsible" for Herder's bodily injury.

On several grounds, the court of appeals held that Ambassador would have been obligated to pay Herder $15,000 under the policy. Memo Dec. at 9. Indeed, commentators and courts alike agree on the proper construction of the clause at issue, which is based on the 1966 Standard Form, *supra* note 1, Part III, ¶ (b). Reworded into simpler syntax, the clause provides that "the insurance company's liability shall be reduced by all sums paid on behalf of any person or organization jointly or severally liable for the bodily injuries sustained by the insured." 2 A. WIDISS, *supra* § 17.3, at 64 (emphasis deleted). In enumerating the persons or organizations encompassed by the clause, Widiss acknowledges that an insured may be legally entitled to recover from persons or organizations other than the uninsured motorist. *Id.*, § 18.1, at 71. But his enumeration of the others who are "legally responsible" includes only parties responsible for the *infliction* of the injuries: the owner of the vehicle operated by the uninsured driver, the employer of the uninsured driver, and joint tortfeasors. *See id.* It does not include insurers whose contractual liability is not based upon responsibility for inflicting the injuries. *See also* 8D Appleman, *supra* § 5131, at 196 (reducing clause of limit-of-liability provision is not limited to recoveries secured from the uninsured motorist, but extends to others who may have produced his injuries).

Caselaw on this issue is in accord. In *Mid–Central Mutual Casualty Co. v. Spanjer*, 101 Ill.App.2d 468, 243 N.E.2d 452 (1968), for example, the appellate court considered a limit-of-liability clause substantially similar to the one we consider:

> Any amount payable under the terms of this endorsement because of bodily injury sustained in an accident by a person who is an insured under this coverage shall be reduced by

(1) all sums paid on account of such bodily injury by or on behalf of (i) the owner or operator of the uninsured automobile and (ii) any other person or organization jointly or severally liable together with such owner or operator for such bodily injury.

*Id.* at 470–71, 243 N.E.2d at 454.

The defendants in *Spanjer* were the owner and occupants of a station wagon struck by a hit-and-run driver. Two liability policies, each with uninsured motorist protection, covered the occupants of the station wagon. One, issued by Government Employees' Insurance Company (GEICO), covered the station wagon's driver. The other, issued by Mid–Central Mutual Casualty Company, covered the station wagon's owner and all occupants. After GEICO paid the limits of its liability, Mid–Central argued that the amount of its award should be reduced accordingly. Like the Fund in the instant case, it reasoned that GEICO's payments were made "on behalf of" the uninsured motorist.

The court soundly rejected this argument:

[GEICO's] liability arose from its contractual relationship with its named insured, and the payments which it made to defendants were not made by or on behalf of the owner or operator of the uninsured automobile. It is true that under the terms of [GEICO's] endorsement the amounts payable are those which defendants are legally entitled to recover from the uninsured motorist, but the sole effect of this provision is to determine the amount of [GEICO's] contractual liability.

*Id.* at 472, 243 N.E.2d at 454. *See also Michigan Mutual Liability Insurance Co. v. Karsten,* 13 Mich.App. 46, 163 N.W.2d 670 (1968) (interpreting prohibition against unapproved settlement with "any person or organization who may be legally liable" to mean that the insured may not settle with a person legally liable for injuries caused by an accident arising out of the ownership, maintenance or use of the *uninsured* vehicle); *Commissioners of the State Insurance Fund v. Miller,* 4 A.D.2d 481, 166 N.Y.S.2d 777 (1957) (rejecting argument of Workers' Compensation carrier that uninsured motorist insurance carrier insures the *tortfeasor* against liability), *cited with approval in Allied Mutual Insurance Co. v. Larriva,* 19 Ariz.App. 385, 507 P.2d 997 (1973).

■ We agree with the *Spanjer* court and commentators and hold that the nonnegligent driver's insurer is not one of the persons or organizations legally responsible for Herder's injuries. The reducing clause of Ambassador's uninsured motorist coverage applies only to payments made by the tortfeasor, those responsible for the tort and those who indemnify them, including, of course, any partial liability insurer of the tortfeasor. It does not include insurers with whom the victim has contracted for coverage.

## CONCLUSION

We hold that the Fund is in the position of an excess carrier. If the claim is covered, the Fund is responsible to pay any damages which Herder incurred, less the primary coverage. The Fund cannot be required to pay more than $100,000 or the limits of the Ambassador policy, whichever is lower.

The trial court's judgment is affirmed. The opinion of the court of appeals is vacated. *Arizona Property & Casualty Insurance Guaranty Fund v. Ueki* is disapproved. The case is remanded for further proceedings consistent with this opinion.

GORDON, C.J., and CAMERON, HOLOHAN and MOELLER, JJ., concur.