**DISTRICT OF COLUMBIA INSUR-
ANCE GUARANTY
ASSOCIATION, Plaintiff,**

v.

**NATIONAL RAILROAD PASSENGER
CORPORATION, Defendant.**

Civ. A. No. 87–3169.

United States District Court,
District of Columbia.

Aug. 21, 1989.

J. Snowden Stanley, Jr., Thomas G. Hagerty, Washington, D.C., for plaintiff.

John J. Tigert, IV, Katheryn A. Ledig, Washington, D.C., for defendant.

MEMORANDUM OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on the parties' cross-motions for summary judgment. After careful consideration of all the pleadings, the entire record, and the District of Columbia Insurance Guaranty Association Act, D.C.Code § 35–1901 *et seq.* (the DCIGA Act or the Act), the Court grants defendant National Railroad Passenger Corporation's (Amtrak) motion and denies plaintiff District of Columbia Insurance Guaranty Association's (DCIGA) motion.

*Background*

The facts of the case are clear and begin with two separate Amtrak train accidents, one occurring on March 5, 1984, in Kittrell, North Carolina, and the other occurring on July 7, 1984, in Essex Junction, Vermont.

At the time of those incidents, Amtrak was insured under two groups of insurance policies providing coverage in two layers. The first layer policies, referred to as Level I policies, were to cover the portion of losses between $1 million and $3.5 million.[1] Amtrak also had a second layer of policies which were issued to cover the portion of losses between $3.5 million and $6 million (Level II policies). The second layer policies are as follows:

### Level II

| Insurance Co. | Policy No. | Period Covered | % Loss Covered. |
|---|---|---|---|
| **Transit Casualty**[2] | **IM203003** | **1/3/84—7/7/84** | **30%** |
| Royal | PQSD30369 | 1/31/84—10/24/84 | 30% |
| National Union | IMB4508907 | 1/31/84—12/8/84 | 25% |
| Lloyds | 614NTB718 | 1/31/84—12/8/84 | 15% |

Amtrak made claims on each of the Level I and Level II insurers with regard to both the Kittrell and the Essex Junction occurrences in the total amount of $4,170,887 for the Kittrell incident and $5,829,939 for the Essex Junction incident. Amtrak subsequently recalculated the amount of overhead rates of repair and resubmitted the Proofs of Loss in the amounts of $3,723,383 for the Kittrell loss and $5,579,508 for the Essex Junction loss. In October 1985, all participating underwriters, including Transit Casualty, agreed to pay their shares of the reduced settlement amounts.[3] Amtrak received payment in full from all the underwriters on both claims except the portions due from Transit, because Transit was declared insolvent on December 3, 1985, and was placed into receivership by the Circuit Court of Cole County, Missouri.

Transit's insolvency triggered the DCIGA's obligation to perform certain of Transit's policy obligations subject to the conditions and limitations set forth in the DCIGA Act.[4] Transit's insolvency also led to this controversy.

### Discussion

The central issue is whether Amtrak failed to exhaust its remedies as required by the Act. The DCIGA claims that Amtrak did so fail, and thus Amtrak cannot recover from the DCIGA for Transit's insolvency. Amtrak contends that it has complied with the statutory exhaustion provisions, and thus that the DCIGA is obligated to pay Amtrak's claims. Both parties argue that the plain meaning of the

---

1. The Level I policies were as follows:

   | Insurance Co. | Policy No. |
   |---|---|
   | Mutual Fire, Marine Inland Insurance Co.— | R5815 |
   | National Union Fire Insurance Co.— | IMB 4508899 |
   | International Surplus Lines Insurance Co.— | RR2520 |

   The exhaustion of these policies is not in dispute in this case. All first level insurance companies have paid up to their limits.

2. This is the policy in question. Transit was declared insolvent after the two incidents. Amtrak had two policies with Transit; however, the second policy, number IF40102, is not involved in this dispute as it did not become effective until after the Kittrell and Essex Junction losses.

3. Plaintiff disputes that Transit agreed to pay its pro rata share; however, plaintiff has failed to give the Court any information which would show that there is a question as to its truth. In plaintiff's exhibits, there is evidence that Transit had agreed to pay its share. *See* Defendant's Answers to Interrogatories, Answer No. 13; Deposition of Marlin R. Smith, Jr., Ins. 10–20, p. 30. Plaintiff bears the burden of establishing that Transit did not so agree. Plaintiff has not met that burden. In fact, it is clear to the Court that there is no genuine issue of material fact on this issue. Therefore, the Court rules as a matter of law that Transit had agreed to pay its share of the reduced settlement amount. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

4. The DCIGA Act states that the DCIGA is deemed "the insurer to the extent of its obligation on the covered claims and to such extent shall have all the rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." D.C.Code § 35–1906(a)(2).

DCIGA Act and the second level insurers' contracts support their positions.

The DCIGA Act was enacted by Congress to "provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer...." D.C.Code § 35–1901. In order to accomplish those goals and protect insured participants, the Act created the plaintiff, the District of Columbia Insurance Guaranty Association, which is a nonprofit unincorporated legal entity. The Act is modeled after the National Association of Insurance Commissioners' State Post–Assessment Insurance Guaranty Association Model Bill. All insurers who are licensed to transact insurance in the District of Columbia are members. D.C.Code § 35–1904. The DCIGA is funded through assessments of each member insurer in proportion to the net direct written premiums of the member insurer as set forth in D.C.Code § 35–1906(b).

Once an insurer is deemed insolvent, the DCIGA steps in to act as if it were the insolvent insurer. To that extent, it has "all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." D.C.Code § 35–1906(a)(2). While the DCIGA is responsible for the covered claims of the insured, up to $300,000, the DCIGA Act protects its funds against duplication of recovery and non-exhaustion of remedies. D.C.Code § 35–1909(a)(1), § 35–1910(a). Section 1910(a) of the Act provides that:

> Any person having a claim against an insurer under any provision in an insurance policy, other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his right under such policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under such insurance policy.

There is no debate over the insolvency of Transit; the debate revolves solely around the issue of whether Amtrak exhausted its claims under the Act and thus is eligible to receive funds from the DCIGA. The above-quoted nonduplication of recovery clause is the cornerstone of this dispute. Plaintiff DCIGA, based on its reading of the exhaustion and reduction provisions, makes two main assertions: (1) Amtrak failed to exhaust its rights under its Level II policies as to both the Essex Junction and Kittrell incidents by not recovering from the solvent Level II policies up to their maximum policy amounts; and (2) Amtrak cannot recover from the DCIGA, even if the DCIGA is obligated to pay, because Amtrak's recovery under Level I policies, and required recovery under Level II policies, reduces any obligation the DCIGA is otherwise determined to have such that no remaining claim against the DCIGA exists.

In support of the DCIGA's first assertion, that Amtrak has failed to meet the exhaustion requirements set forth in § 35–1910(a), the DCIGA relies on an extracted reading of the statute and the second level insurance contracts. The DCIGA claims that the terms of Amtrak's Level II policies require solvent Level II insurers to bear the risk of insolvency of one of the other second level insurers. The DCIGA claims that by failing to demand, to the extent of litigation if necessary, that the other Level II policies pay up to their policy limits to make up for the proportion of the loss that Transit was to pay for, Amtrak did not exhaust its rights under such other policies, and accordingly cannot recover from the DCIGA.

Plaintiff argues that the contracts, which for the most part contain identical wording, expose the insurers to a pro rata share of the "ultimate net loss" incurred by Amtrak, including loss equated to the failure of one of the insurers to pay its pro rata share due to insolvency. Because the contracts do not expressly deal with such a situation, plaintiff looks to two clauses which appear in each of the second level policies: One provides that in the event of loss "the Underwriters will pay or make good all such loss in accordance with policy terms and conditions ..."; the second defines "ultimate net loss" as the "[s]ums

actually borne by the Assured after making deductions for all recoveries, all salvages and all collectible claims upon other insurances, except as respects insurance procured in accordance with 'VIII–H' [the first level policies]." [5] Thus plaintiff reasons, the claims rendered uncollectible by reason of Transit's insolvency become part of the "ultimate net loss," and must be born by the other Level II insurers.

In viewing insurance contracts the Court should look to the entire instruments and all of their provisions to ascertain their meaning and construe such a contracts as a whole. 13 J.A. Applemen & J. Applemen, Insurance Law & Practice § 7383 (rev. ed. 1976). "Policy provisions providing for the proration of loss between several insurers are valid and enforceable and are given effect according to their terms." 16 Couch on Insurance 2d. § 62:26 (rev. ed. 1983); *see also State Farm Mutual Automobile Insurance Co. v. United Services Automobile Ass'n*, 211 Va. 133, 176 S.E.2d 327 (1970). In looking at the entire contract and the entire context of the policies at issue, the Court concludes that the second level policies do not require that the other second level insurers increase their contracted-for percentages of loss by assuming the loss originally covered by Transit.

Three key factors make this clear as a matter of law to the Court. First, the second level insurers are referred to as "Underwriters." Plaintiff assumes that the "Underwriters" are one and the same as the "other insurances." Based thereon, plaintiff infers that the contracts require that the underwriting insurance companies pick up Transit's coverage since the contracts state that the net loss covered by the underwriters includes uncollectible claims "upon other insurances." This Court is satisfied that "other insurances" do not include the pro rata insurance provided by the Underwriters of the second layer policies. Any other reading would fly in the face of the plain meaning of the contracts.

Second, the contracts expressly state that the Underwriters are "severally and not jointly liable for that proportion of such loss as the sum set against its name in the list of subscribing Underwriters bears to the total limit of liability as set forth ... with respect to each Underwriter...." To read the contract in the manner suggested by plaintiff, the Court would be construing each Underwriter as jointly liable for the loss, in direct contradiction to the terms of the contract.

Third, such a reading contradicts the purposes and policies of the Act. The Act, which was in place at the time of the second level underwriters' contracting, sets forth the procedure followed when an insurer becomes insolvent. Each of the underwriters, by being licensed in the District of Columbia, is a member of the DCIGA and cognizant of the fact that if an insurer becomes insolvent, the DCIGA generally takes on the obligations of the insolvent insurer. D.C.Code § 35–1906(a). Given this factor, plaintiff's reading of the contracts is illogical. To construe it in such a manner would be totally to recreate the risk that each underwriter agreed to bear.

**5.** Amtrak's Level II policies have a clause that states:

In consideration of the Assured having undertaken to pay each of the Underwriters named in the list of the subscribing Underwriters forming a part hereof a premium, the Underwriters severally and not jointly agree, each for the sum insured set against its name in the list of subscribing Underwriters, (subject to the terms and conditions herein or endorsed hereon, and which are to taken as part of this policy), that if loss should arise as specified in this policy and endorsements attached hereto while this policy is in force, the Underwriters will pay or make good all such loss in accordance with the policy terms and conditions herein or endorsed hereon.

It is also understood and agreed that as regards each loss each Underwriter shall only be severally and not jointly liable for that proportion of such loss as the sum set against its name in the list of subscribing Underwriters bears to the total limit of liability as set forth in Item III hereof, or such other sums as may be substituted therefor by endorsement with respect to each Underwriter or the total limit.
[Plaintiff's Motion for Summary Judgment, Ex. E. This reflects wording found in the four Level II policies. The Lloyd's of London policy has slight, nonsubstantive differences.]

A construction which neutralizes or changes any "provision of a contract should never be adopted if the contract can be so construed as to give effect to all the provisions." 13 J.A. Applemen & J. Applemen, Insurance Law and Practice § 7383 (rev. ed. 1976).

■ Plaintiff next alleges that even if Amtrak has exhausted its claims, Amtrak would not be entitled to recover anything from the the DCIGA because the recoveries made by Amtrak under its first and second level policies reduce the DCIGA's obligation, such that the DCIGA has no obligation under the Transit policy with respect to both the Kittrell and Essex Junction occurrences.

The DCIGA Act has a nonduplication of recovery clause to protect against windfall recoveries where a party is placed in a better position that it would have been had its insurer not gone insolvent. D.C.Code § 35–1910(a). This clause, when considered with the exhaustion provision discussed above, provides that where an individual has more than one insurance policy that covers the same claim, the amount paid by the other policy should be deducted from the total amount payable as damages for the claimant's injuries caused by the covered occurrence. *Arizona Property & Casualty Insurance Guaranty Fund v. Herder*, 156 Ariz. 203, 751 P.2d 519, 523 (1988). This prevents a situation in which an insured collects the amount of the total loss from one insurance company and then gets an additional sum from the DCIGA. Thus, it furthers the statutory purpose of preventing duplication in damage payments to a claimant. *Id.*, 751 P.2d at 524.

Plaintiff claims that under the nonduplication of recovery clause, the money Amtrak is trying to recover from the DCIGA is a "covered claim" under the Act. Therefore, it is contended, any money paid on the covered claim by first and second level insurers reduces the DCIGA's obligation. This reduction clause applies differently to first level insurers and second level insurers. Transit's insurance contract provides that it is an excess policy, which is not owed until Amtrak exhausts its first level claims and Amtrak's self-insurance. If Amtrak had not recovered from its first level or met its self-insurance level, the DCIGA would not be liable because had Transit not gone insolvent, it would not have been responsible for any loss until the first level policies were exhausted. As Amtrak has exhausted its Level I coverage and its self-insurance coverage, Transit would be liable up to the terms and conditions of the contract. Because the first level and the Transit policies do not cover the same loss, the reduction clause does not apply.

In this case, each of the second level insurers agreed to severally bear a percentage of the loss above the ceiling set by the first level insurers. Therefore, while the amounts paid by each insurer may reduce the total loss covered by the second level insurers, it does not reduce Transit's portion of the loss. Likewise, if one of the other insurers had not paid its portion, it would not increase Transit's burden.

Thus the Court finds that Amtrak is not requesting the DCIGA to pay more than the statutory maximum or for more than what Transit had contracted for. Amtrak is only requesting the DCIGA to fulfill its statutory requirement to take on the "rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." D.C.Code § 35–1906(a)(2). The statute's purpose is "to provide a mechanism for the payment of covered claims ... to avoid excessive delay in payment and to avoid financial loss to ... policyholders because of the insolvency of an insurer...." D.C.Code § 35–1901. To accomplish this, DCIGA is required to pay the claims presented by Amtrak due to Transit's insolvency, up to the statutory or policy limits, whichever comes first. Accordingly, plaintiff's motion for summary judgment is denied and defendant's motion is granted.