**Rong Yao ZHOU, et al., Appellants,**

v.

**JENNIFER MALL RESTAURANT, INC., et al., Appellees.**

No. 94–CV–1175.

District of Columbia Court of Appeals.

Argued June 4, 1996.

Decided Aug. 7, 1997.

Frederic W. Schwartz, Jr., with whom James Taglieri, was on brief, Washington, DC, for appellants.

William Clague, Bethesda, MD, with whom Joseph C. Tanski and David R. DeVeau, Boston, MA, were on brief, for appellees.

Before FERREN, FARRELL, and RUIZ, Associate Judges.

RUIZ, Associate Judge.

This is the second time that appellants, husband and wife Rong Yao Zhou and Xiu

Jan Wu ("Zhous"), come before this court in connection with a 1982 car accident involving a drunk driver who had been served alcohol by Jennifer Mall Restaurant Inc. ("JMR"). On the first appeal, we remanded the case for trial after holding that it is negligence *per se* for a vendor to sell alcoholic beverages to an already intoxicated person, in violation of the Alcoholic Beverage Control Act, D.C.Code § 25–121(b) (1996), and that such a negligent vendor is liable for injuries to third parties, such as the Zhous, if their injuries are proximately caused by the vendor's violation of the Act. *Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 1268, 1276 (D.C.1987). On remand, after the parties stipulated to JMR's liability, the trial court granted summary judgment in favor of appellees, JMR and the District of Columbia Insurance Guaranty Association ("DCIGA"), on the ground that the DCIGA's payment of $100,000 to the Zhous satisfied its obligation under the District of Columbia Insurance Guaranty Act (Act), D.C.Code §§ 35–1901 to –1917 (1993),[1] because the DCIGA could deduct a $200,000 settlement that the Zhous had received from the drunk driver's insurance from DCIGA's $300,000 maximum statutory liability. On appeal, the Zhous argue that the trial court misinterpreted §§ 35–1903(2) and –1910(a) of the Act and that DCIGA is not entitled to deduct the amount paid by the drunk driver's insurance from DCIGA's statutory obligation. We agree; we reverse the grant of summary judgment for DCIGA and remand for entry of summary judgment in favor of the Zhous.

## I.

The Zhous settled with the drunk driver's insurance carrier and recovered $200,000. At the time of the accident in 1982, Union Indemnity of New York ("Union") insured the restaurant, JMR, with a maximum coverage of $300,000, under a liquor liability policy. After Union's insolvency,[2] the DCIGA became obligated to indemnify the Zhous

under the Act. D.C.Code § 35–1906(a)(1) and (2). The parties stipulated that, at a minimum, DCIGA owed the Zhous $100,000, representing the difference between Union's $300,000 policy limit and the $200,000 recovered from the drunk driver's insurer. DCIGA paid the undisputed $100,000 to the Zhous. The parties also stipulated that if the court determined that the Act, D.C.Code § 35–1910(a), did not require the $200,000 to be subtracted from the DCIGA's liability, and if appellants' claim is deemed a "covered claim" under the Act, § 35–1903(2), DCIGA would pay to the Zhous an additional $200,-000.[3] The DCIGA would not, however, be liable beyond the $100,000 already paid by DCIGA to the Zhous if the court determined that the Zhous' claim is not a "covered claim."

Based on the stipulated facts, all parties filed motions for summary judgment. The DCIGA asserted, and the trial court agreed, that the DCIGA owed only $100,000, because the Zhous' recovery of $200,000 under the drunk driver's policy is to be deducted from the DCIGA's maximum liability of $300,000 pursuant to D.C.Code § 35–1910(a). The trial court did not reach the question whether the Zhous' claim is a "covered claim" under the Act.

## II.

■ Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Nader v. de Toledano*, 408 A.2d 31, 41 (D.C.1979) (quoting Super. Ct. Civ. R. 56(c)). This court's review is the same as that of the trial court in considering whether a motion for summary judgment should be granted. *Osei–Kuffnor v. Argana*, 618 A.2d 712, 713 (D.C.1993); *Kuder v. Unit-*

---

1. The Act was repealed on October 21, 1993, D.C. Law 10–51, § 17, 40 D.C.Reg. 6120, and replaced by the Property and Liability Insurance Guaranty Association Act of 1993. D.C.Code §§ 35–3901 to –3915 (1997).

2. A court declared Union insolvent and the parties stipulated to the insolvency.

3. The Zhous' injuries were stipulated to be in excess of $300,000.

*ed Nat'l Bank,* 497 A.2d 1105, 1106–07 (D.C. 1985).

 This appeal presents us exclusively with a legal question of first impression, the interpretation of §§ 35–1903(2) and –1910(a) of the Act. The Zhous argue that in light of the Act's remedial purpose, this court should liberally construe the Act's coverage provisions and narrowly interpret its limitations. *See Hutchison Bros. Excavation Co. v. District of Columbia,* 278 A.2d 318, 321 (D.C. 1971). DCIGA contends, on the other hand, that the remedial purpose of the Act should not be used to override the express limitations on recovery which were placed into the Act under §§ 35–1903 and –1910. *See Backhus v. Transit Cas. Co.,* 549 So.2d 283 (La. Sup.Ct.1989). We do not tilt in either direction. When interpreting statutory language this court gives effect to the plain meaning of the words and " '[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.' " *West End Tenants Ass'n v. George Washington Univ.,* 640 A.2d 718, 726 (D.C.1994) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). "Where the legislature has not defined words used in the act, the court must then determine the meaning of the language in accordance with the legislative intent and common understanding to prevent absurdities and to advance justice." 1A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 20.08 (5th ed.1993).

The relevant statutory provisions are not models of clarity and there is virtually no legislative history to guide us. We do note, however, that the Act is based on the Post–Assessment Property and Liability Insurance Guaranty Association Model Act which was prepared by the National Association of Insurance Commissioners in 1969. *District of Columbia Ins. Guar. Ass'n v. Algernon Blair, Inc.,* 565 A.2d 564, 565 (D.C.1989). All fifty states have adopted some form of the model act. Paul G. Roberts, *Insurance Company Insolvencies and Insurance Guaranty*

*Funds,* 74 IOWA L. REV. 927, 934 (1989). Nonetheless, there is a dearth of case law on the provisions relevant to the case before us.

We begin with the Act's declaration that one of its purposes is "to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of insolvency of an insurer." D.C.Code § 35–1901. To this end the Act created DCIGA, a nonprofit unincorporated legal entity. D.C.Code § 35–1904. All insurers who are licensed to transact business within the District of Columbia are automatically members of the DCIGA. *Id.* The DCIGA is funded by an assessment on each of its member insurers. D.C.Code § 35–1906. Pursuant to the Act, when an insurance company becomes insolvent, the DCIGA is "deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." D.C.Code § 35–1906(a)(2). In other words, "DCIGA steps in to act as if it were the insolvent insurer." *District of Columbia Ins. Guar. Ass'n v. National R.R. Passenger Corp.,* 721 F.Supp. 1378, 1380 (D.D.C.1989), *aff'd mem.,* 288 U.S.App. D.C. 257, 925 F.2d 488 (D.C.Cir.1991). The DCIGA is obligated to indemnify a "covered claim," D.C.Code § 35–1906(a)(1), which is defined as "an unpaid claim, including one for unearned premiums, which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy" issued by an insolvent insurer member of DCIGA. D.C.Code § 35–1903(2). The DCIGA's obligation to pay a covered claim, after a $100 deductible, is capped at the lesser of $300,000, or the limit of the insolvent insurer's policy obligation. D.C.Code § 35–1906(a)(1).[4]

 In addition to the statutory payment cap, the Act protects DCIGA's funds by requiring prior exhaustion and set-off of certain other insurance coverage. Section 35–

---

4. Because the Union insurance policy at issue has a limit of $300,000, the statutory cap does not come into play.

1910(a), entitled "Nonduplication of recovery," provides in part:

> Any person having a claim against an insurer under any provision in an insurance policy, other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his right under such policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under such insurance policy.

This section requires: 1) that a claimant with an alternative source of insurance coverage for a covered claim must first exhaust that alternative sources before seeking compensation from the DCIGA, and 2) that the DCIGA's obligation be reduced by the amount of duplicate coverage of the covered claim from alternative sources of insurance. These two clauses together "provide[ ] that where an individual has more than one insurance policy that covers the same claim, the amount paid by the other policy should be deducted from the total amount payable as damages for the claimant's injuries caused by the covered occurrence." *National R.R., supra,* 721 F.Supp. at 1382 (citing *Arizona Property & Cas. Ins. Guar. Fund v. Herder,* 156 Ariz. 203, 751 P.2d 519, 523 (1988) (en banc)). The nonduplication of recovery and exhaustion requirements "prevent[ ] a situation in which an insured collects the amount of the total loss from one insurance company and then gets an additional sum from the DCIGA." *Id.* Thus, the provision prevents claimants from double recovery or windfall by virtue of an insurance company's insolvency. *Id.*; *see also Aztec Well Servicing Co. v. Property & Cas. Ins. Guar. Ass'n,* 115 N.M. 475, 853 P.2d 726 (1993).[5]

■ Whether DCIGA is statutorily obligated to pay any amount to the Zhous as a result of the insolvency of JMR's insurer depends on whether the Zhous' claim against JMR's insurer is a "covered claim." Similarly, assuming that DCIGA is so obligated, whether its obligation is limited by the Zhous' recovery from the drunk driver's insurance also depends on whether the Zhous'

claim against the drunk driver's insurer is a "covered claim." We therefore turn first to what is a "covered claim."

A "covered claim," as defined by § 35-1903(2), "means an unpaid claim . . . which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy . . . issued by an insurer, if such insurer becomes an insolvent insurer. . . ." The Zhous argue that their claim against JMR's insolvent insurer comes within the definition of a "covered claim" because: (1) it is "unpaid," in that they have not received full payment from JMR or on behalf of JMR's insurer, aside from the uncontested $100,000 from the DCIGA, (2) it "arises out of . . . an insurance policy to which this chapter applies," that is, it arises out of JMR's insurance policy and JMR's insurer is insolvent, (3) it is "within the coverage" of JMR's policy, which insured against JMR's negligence, because JMR's counsel stipulated to liability on this issue, and (4) it is "not in excess of the applicable limits" of JMR's policy, $300,000. Further evidence that their claim is a "covered claim" is that DCIGA has already paid $100,000 demonstrating that the Zhous satisfy the definitional requirements. DCIGA disagrees only with the point that the Zhous' claim is "unpaid," as a result of the Zhous having received compensation for their loss—the $200,000 settlement from the drunk driver's insurer.

We believe that the Zhous' interpretation is consistent with the language and purpose of the Act. First, we note that § 35-1903 uses the word "claim" not "loss." A "claim" is defined as "[t]o demand as one's own or as one's right; to assert; to urge; to insist. A cause of action. Means by or through which claimant obtains possession or enjoyment of privilege or thing. Demand for money or property as of right, *e.g.* insurance claim." BLACK'S LAW DICTIONARY 247 (6th ed.1990). A "loss," on the other hand, is defined as "a generic and relative term. It signifies the act of losing or the thing lost; it is not a word of limited, hard and fast meaning and has been held synonymous with, or equiva-

---

5. In view of the parties' stipulation that DCIGA's additional liability would be limited to $200,000, we do not address whether any permissible offset would be applied against the Zhous' damages or DCIGA's maximum liability under the Act. *See Aztec, supra,* 853 P.2d at 731.

lent to, 'damage', 'damages', 'deprivation', 'detriment', 'injury', and 'privation'. . . . The word in insurance policy in its common usage means a state of fact of being lost or destroyed, ruin or destruction." BLACK'S LAW DICTIONARY 945 (6th ed.1990). The insurance commissioners who drafted the model act can be assumed to have understood the terms "claim" and "loss" as having separate meanings in the insurance context. We interpret words in the statute according to their plain meaning. *Ashton Gen. Partnership v. Fed. Data,* 682 A.2d 629, 636 (D.C.1996); *West End, supra,* 640 A.2d at 726. Here, the word "claim" has a plain meaning synonymous with a cause of action under an insurance policy. Hence, we conclude that because the Zhous' claim against JMR remains partially unpaid, even though their loss has been partly compensated, the Zhous' claim against JMR is a "covered claim." *See Connecticut Ins. Guar. Ass'n v. Union Carbide Corp.,* 217 Conn. 371, 585 A.2d 1216, 1222 (1991) (interpreting Connecticut's equivalent provision to § 1903(a) and holding that a "covered claim" is a right by individual claimants to recover under an insurance policy and rejecting interpretation of "claim" as an "occurrence").

The Zhous concede that if their claim against the drunk driver also came within the definition of a "covered claim," the DCIGA would be entitled to deduct the $200,000 settlement under the Act's nonduplication provision, D.C.Code § 35–1910. We thus turn to an analysis of § 35–1910. The Zhous argue that the exhaustion and nonduplication provisions of § 35–1910 apply only when the *same claim* that could have been brought against the insolvent insurer can be brought under the policy of a solvent insurer. DCIGA, on the other hand, contends that § 35–1910(a) applies whenever payment for the *same loss* can be obtained under another policy issued by a solvent insurance company. We have already distinguished between the terms "claim" and "loss," and concluded that a claim is a cause of action or demand as of right. Section 35–1910(a) applies only if the "claim" against another insurer would have been a "covered claim." If the word "loss" were substituted for "claim" in the statutory definition of "covered claim," the phrase "which arises out of . . . the coverage" would have no meaning. We interpret statutory provisions so as to give effect to all the statutory language. 2A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 46.06 (5th ed.1993). A "covered claim" subject to the exhaustion and nonduplication limitation in D.C.Code § 35–1910, therefore, has to be the *same* kind of claim, but against a solvent insurer, as one that could have been brought against the insolvent insurer covered by the Act.

Based on this interpretation of the statutory language, the Zhous' claim against the drunk driver cannot be a "covered claim" because it could not have "arisen out of" or come "within the coverage of" JMR's insurance policy. The Zhous' claim against JMR is different from their claim against the drunk driver. *Zhou,* held that "the unexcused violation by a tavern keeper of D.C.Code § 25–121(b) (1981), by serving a person already intoxicated or apparently intoxicated, renders the tavern keeper negligent *per se,* and that where injuries are proximately caused to a member of the public by that violation the tavern keeper may be liable in damages." 534 A.2d at 1276. The claim against the drunk driver was based on the driver's negligent conduct, independent of JMR's violation of D.C.Code § 25–121. Because the Zhous could not have brought their claim against JMR under the drunk driver's insurance, the Zhous' claim against the drunk driver's insurance is not a "covered claim," subject to the nonduplication limitations of § 35–1910.

Our interpretation of what is a "covered claim" is consistent with the purpose of the Act to provide a measure of protection to claimants against insolvent insurers by putting DCIGA in the shoes of the insolvent insurer, up to a maximum liability of $300,-000. *See National R.R., supra,* 721 F.Supp. at 1380. This interpretation is also consistent with *National R.R.,* in which payment made to Amtrak by its first and second level excess insurers was not deducted from DCIGA's liability resulting from the insolvency of one of the four second level excess insurers.

721 F.Supp. at 1382.[6] A second level excess insurer, by definition, does not insure the same claim as a first level insurer because it is beyond the limit of the first level insurance policy. *See Aztec, supra,* 853 P.2d at 731 ("To require an offset, as the Association urges, of the amount recovered from the primary insurance carrier against the Association's liability would be absurd because it was that recovery which triggered the application of [the claimant's] excess insurance policy in the first place."). Therefore, recovery from a first-level insurer would not be a "covered claim" under § 35–1903 because it could not have been brought under the policy of the insolvent second level insurer. *National R.R., supra,* 721 F.Supp. at 1382. The DCIGA could not offset Amtrak's recovery from the three second level excess insurers because the court determined that the second level insurers had "agreed to severally bear a percentage of the loss above the ceiling set by the first level insurers." *Id.* Therefore, the claims against the solvent excess insurers were not "covered claims" because they also were based on a different liability than that of the insolvent insurer. We note that the claims were treated as different claims even though the same *loss* was involved in the claims against the first and second level insurers.[7]

Our interpretation is also consistent with the contrary result, applying statutory provisions equivalent to D.C.Code § 35–1910(a) in cases involving claims made under an individual's uninsured motorist policy. This situation typically arises in the following circumstances: driver A, who has uninsured motorists insurance, is involved in an accident with driver B, the tortfeasor. When driver B's insurance is declared insolvent, driver A recovers from his or her own uninsured motorists policy. Driver A then attempts to recover from the state insurance guaranty association which has stepped into the shoes of the tortfeasor's insolvent insurer. Because the claim against driver A's uninsured motorists policy is the same claim as the one brought against driver B's insolvent insurer, the insurance association can deduct the amount recovered from the injured party's uninsured motorists policy from the amount it is statutorily obligated to pay to the injured party. *See Stecher v. Iowa Ins. Guar. Ass'n,* 465 N.W.2d 887 (Iowa 1991) (holding that Iowa Insurance Guaranty Association was entitled to offset its liability on behalf of a driver's insolvent insurer by the amount received from the claimant's uninsured motorist benefits); *Hawkins v. Kentucky Ins. Guar. Ass'n,* 838 S.W.2d 410 (Ky.Ct.App.1992) (same); *McMahon v. Caravan Refrigerated Cargo, Inc.,* 406 Pa.Super. 303, 594 A.2d 349, 352 (1991) (holding that the Pennsylvania Insurance Guaranty Association was entitled to deduct any amount of uninsured motorist benefits received by claimant from his own insurer); *Blackwell v. Pennsylvania Ins. Guar. Ass'n,* 390 Pa.Super. 31, 567 A.2d 1103 (1989) (same). These cases stand for the proposition that where an injured plaintiff has alternative sources of insurance covering the same claim as the claim against the insolvent insurer, the courts interpret the nonduplication provision as requiring the plaintiff to exhaust the solvent policy and deduct the amount recovered from the obligation due by the state insurance guaranty association.[8]

**6.** In *National R.R.,* Amtrak was insured by two levels of insurers: the three insurers in the first level covered the portion of losses between $1 million and $3.5 million, and the four insurers in the second level covered the portion of losses between $3.5 million and $6 million. 721 F.Supp. at 1379. *National R.R.* involved DCI-GA's obligation to make payments to Amtrak after one of Amtrak's second level insurers became insolvent. *Id.*

**7.** Similarly, in *Washington Ins. Guar. Ass'n v. McKinstry Co.,* 56 Wash.App. 545, 784 P.2d 190 (1990), the court held that Washington Insurance Guaranty Association ("WIGA") could not offset payments by a primary insurer when WIGA was replacing the insolvent excess insurer. WIGA argued that a claimant had to exhaust all other sources of recovery before seeking payment from WIGA. The court, however, held that "the statute provides for a reduction of WIGA's statutory obligation *only* where a claimant has another source of recovery for the claim *against the insolvent insurer,* not where a claimant has *any* other source of recovery." *Id.* 784 P.2d at 192.

**8.** The DCIGA cites *Hebert v. Martin,* 583 So.2d 143 (La.Ct.App.1991), where the court reduced the Louisiana Insurance Guaranty Association's ("LIGA") obligation on behalf of an insolvent insurer by the amount of the medical expenses the plaintiff had already received from her own

*See Insurance Com'r v. Property & Cas. Ins. Guar. Corp.*, 313 Md. 518, 546 A.2d 458, 463 (1988) (recovery from a solvent insurer of a claim different than the one against the insolvent insurer is not a "windfall" prohibited by the nonduplication provision).

The Zhous argue that the purpose of § 35–1910(a) is to preclude duplicative claims and that they have two different claims, one against each of the driver's and JMR's insurers. These claims are different because they arise from two separate causes of action in negligence against the driver and JMR: the driver was liable for driving drunk, and JMR was liable for serving liquor to an already intoxicated person. *See Zhou, supra,* 534 A.2d 1268. In support of this interpretation, the Zhous note that they could not have collected from JMR for the driver's negligent driving, nor vice versa. They concede that if they had recovered $200,000 from another, solvent insurer of JMR, DCIGA could reduce its obligation to pay by that amount. However, because the $200,000 they already received did not come from an insurer of JMR, but from the drunk driver's policy, the amount owed by DCIGA under the JMR policy issued by an insolvent insurer is not duplicative of the settlement.

DCIGA and JMR, on the other hand, contend that § 35–1910(a) was meant to offset any insurance recovery for the loss suffered by an injured party. Because the Zhous have suffered, and are claiming compensation for, only one loss arising from one incident, the fact that they may have a number of causes of action resulting in different claims is immaterial to whether their claim against JMR is duplicative of their claim against the drunk driver. They rely on *Oglesby v. Liber-*

*ty Mut. Ins. Co.,* 832 P.2d 834 (Okla.1992), for the proposition that any recovery from any other insurance covering the same injury or loss must be applied to reduce DCIGA's statutory liability even though the Zhous may have separate and distinct causes of action against different co-defendants.

In *Oglesby,* Mr. Oglesby, a Louisiana resident, died on the job, whereupon Mrs. Oglesby and her children began receiving worker's compensation from the Louisiana Insurance Guaranty Association after the employer's insurance company was declared insolvent. 832 P.2d at 837. They brought suit against two manufacturing companies and their insurance providers, alleging that the manufacturers negligently manufactured the rig on which Mr. Oglesby was killed. *Id.* After the suit was filed, both manufacturing companies filed for bankruptcy and were dismissed along with one of the manufacturer's insurance providers, which also went bankrupt. Because one of the manufacturers was an Oklahoma corporation, the Oklahoma Guaranty Association (OGA) became a defendant along with the remaining solvent insurance company, Liberty Mutual. *Id.* at 837–38. Interpreting a provision of the Oklahoma statute almost identical to D.C.Code § 35–1910(a), the Oklahoma court held for OGA finding that the Oglesbys must first exhaust their rights against Liberty Mutual and then apply any amount recovered from Liberty Mutual against OGA's statutory obligation. *Id.* at 842.

Like the Zhous in the present case, the plaintiffs in *Oglesby* asserted that the applicable Oklahoma statutory language[9] required that only a claim against another insurer which would also be a "covered

---

motorist insurance policy. *Id.* at 145. We do not consider that the result in *Hebert* is inconsistent with our interpretation. Similar to the uninsured motorists cases, *Hebert* involved two policies that covered the same claim, as evidenced by the fact that plaintiff's insurer had a subrogation claim against the insolvent insurer. The court concluded that the claimant's recovery from her insurer should be deducted from LIGA's obligation on behalf of the insolvent insurer because the claimant already had received the full amount due her under the insolvent insurer's policy. *Hebert* is inapplicable to this case be-

cause the Zhous have not received any payment from their own insurance policy.

9. Any person having a claim against an insurer under any provision of an insurance policy other than a policy of the insolvent insurer which is also a covered claim shall be required to first exhaust his rights under the policy. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under such other insurance policy.
36 Okla. Stat. § 2012(A) (1981).

claim"[10] against the insolvent insurer under the insurance guaranty scheme had to be exhausted before recovery could be had against OGA. *Id.* at 843. Because a "covered claim" is defined as an "an unpaid claim of an insolvent insurer," *id.,* the Oklahoma Supreme Court concluded that it did not make any sense to restrict the exhaustion and non-duplication requirements only to claims against an insolvent insurer. The *Oglesby* court reasoned that:

> Were we to accept [claimant's] argument the result would be counterproductive—claimants would be required to exhaust only unpaid claims against insolvent insurers, and only those claims recoverable because of the insolvency of an insurance company would be credited against the Oklahoma Guaranty Fund's liability.... We avoid a statutory construction leading to an absurdity ... a claimant must exhaust all other covered claims he/she might have against an insurer, under an insurance policy, before recovering from the Oklahoma Guaranty Association; any amount payable under the Oklahoma Guaranty Act is reduced by the amount recovered.

*Id.* (footnotes omitted).

Although we agree with the *Oglesby* court, as did the trial court in this case, that it would be absurd to require exhaustion of claims against insolvent insurers, the interpretation we adopt would not lead to such an absurd result. Under D.C.Code § 35–1910(a), the phrase "other than a policy of an insolvent insurer"[11] precludes the absurd result of concern in *Oglesby* because it *excludes* from the exhaustion requirement a "covered claim" against insolvent insurers.

We read the statutory provision as a whole, as follows:

> Any person having **a claim against an insurer under any provision in an insurance policy,** *other than a policy of an insolvent insurer* **which is also a covered claim** [*i.e.,* "an unpaid claim ... which arises out of and is within the coverage and not in excess of the applicable limits" of the insolvent insurer's policy, D.C.Code § 35–1906(a)(1) ], shall be required to exhaust first his right under such policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under such insurance policy.

(Emphasis added.)

The bolded language defines the type of claim that must first be exhausted and the benefits of which are set off from DCIGA's liability—it must be a claim that could be brought against the insolvent insurer's policy. The italicized language makes clear, however, that those claims do *not* include claims against insolvent insurers—thus avoiding the absurd result mentioned in *Oglesby.*

The same interpretation of § 35–1910(a) we adopt was applied in *McMahon, supra,* 594 A.2d 349. In *McMahon,* a motorist who was struck by a tractor-trailer sued the owner of the trailer and the owner's insurer. After the owner's insurer was declared insolvent, the motorist attempted to recover from three different state insurance guaranty associations. *McMahon* held that the obligation of the Pennsylvania Insurance Guaranty Association ("PIGA") was to be reduced, under the Pennsylvania provision comparable to D.C.Code § 35–1910(a), by the amount the motorist had recovered from his own uninsured motorist policy. *Id.* 594 A.2d at 352. The court determined, however, that the motorist's recovery from PIGA could not be offset by his wife's recovery from the Texas Insurance Guaranty Association for loss of consortium. *Id.* at 351. The court reasoned that "[a] claim for loss of consortium, although it must be joined with the action for underlying damages, is a separate and distinct claim." *Id.*

---

**10.** At the time, a "covered claim" meant "an unpaid claim of an insolvent insurer." *Oglesby, supra,* 832 P.2d at 843.

**11.** We note that there is a slight difference in language between the Oklahoma and D.C. provisions that could have led to the different result in *Oglesby.* The Oklahoma provision refers to "other than a policy of the insolvent insurer," 36 Okla. Stat. § 2012(A).

We conclude that the Zhous' claim against JMR's insurer is a "covered claim" under § 35–1903(2) which DCIGA is obligated to pay pursuant to § 1906(1)(a) and (2). Because the Zhous' claim against the drunk driver was not a "covered claim," D.C.Code § 35–1910(a) does not apply. Therefore, the settlement amount received from the driver's insurer is not offset against DCIGA's obligation to the Zhous.

The judgment of the trial court is reversed, and the case is remanded for entry of summary judgment in favor of the Zhous.

*So ordered.*