546 A.2d 458

**INSURANCE COMMISSIONER OF the STATE of Maryland**

v.

**PROPERTY AND CASUALTY INSURANCE GUARANTY CORPORATION.**

**No. 102, Sept. Term, 1987.**

Court of Appeals of Maryland.

Aug. 31, 1988.

Meg Lynn Rosthal, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellant.

Albert J. Mezzanotte, Jr. (J. Norris Byrnes, William M. Dolan, III, and Whiteford, Taylor & Preston, all on brief), Towson, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

This case involves claims for Personal Injury Protection (PIP) benefits filed by a number of individuals under policies issued to them by two now insolvent insurance companies. Minimum benefits of $2,500 for PIP coverage are required in every policy of motor vehicle liability insurance issued in Maryland. Coverage includes medical, hospital, wage loss, and disability benefits for the named insured and other designated persons injured in a motor vehicle accident; the benefits are payable without regard to fault, and

without regard to any collateral source of medical, hospital, or wage continuation benefits. Maryland Code (1986 Repl. Vol.), Article 48A (the Insurance Code), §§ 539–540.

In view of the insolvency of their own insurance companies, the claimants sought payment of their PIP claims from the Property and Casualty Insurance Guaranty Corporation (PCIGC). They contended that under subtitle 33 of the Insurance Code, PCIGC was responsible to pay their PIP claims. The Insurance Commissioner, agreeing with the claimants, directed PCIGC to make the PIP payments. PCIGC refused to do so and this litigation between it and the Insurance Commissioner ensued. The questions before us are essentially twofold. The first is whether the Insurance Commissioner has authority to order PCIGC to pay the claims; the second is whether the applicable Maryland statute requires a setoff of PIP benefits payable by PCIGC, acting in the stead of the claimants' insolvent insurers, when, as here, the claimants recovered amounts well in excess of their PIP claims, pursuant to third party liability claims filed by them against tort-feasors insured by solvent insurance companies.

# I

Subtitle 33 of the Maryland Insurance Code is entitled "Property and Casualty Insurance Guaranty Corporation." It contains sixteen sections, from §§ 504 through 519 of Article 48A; these sections relate to the organization, operations, duties, powers, and responsibilities of the PCIGC and are applicable to all kinds of direct insurance except life and health insurance and annuities.[1]

Section 504 provides that the purpose of subtitle 33 is to "provide a mechanism for the prompt payment of *covered claims* under certain insurance policies and to avoid financial loss to residents of Maryland who are claimants or policyholders of an insurer ... which has become insolvent;

---

1. All section references are within Article 48A of the Code unless otherwise indicated.

and to provide for the assessment of the cost of such payments and protection among insurers." (Emphasis supplied.) The term "covered claims" is defined (other than for surety bonds) in § 505(c)(1) to mean "obligations ... of an insolvent insurer which ... [a]rise out of the insurance policy contracts of the insolvent insurer issued to residents of this State or which are payable to residents of this State on behalf of insureds of the insolvent insurer." Section 506 provides that PCIGC is a private, nonprofit, nonstock corporation. Subsection (b) provides that all insurers who write any kind of insurance to which subtitle 33 applies are members of PCIGC "as a condition of their authority to transact insurance in this State." Subsection (c) requires that PCIGC establish a "plan of operation" and subsection (e) provides that it has all the powers, privileges, and immunities granted by the applicable provisions of the Corporations and Associations Article of the Maryland Code. Section 506(f) provides that PCIGC is not an agency or instrumentality of the State and that all its debts, claims, obligations, or liabilities are solely its own.

Section 507 provides for a Board of Directors "elected from member insurers" pursuant to PCIGC's plan of operation. Section 508 invests PCIGC with duties and powers as therein delineated; these include being obligated "to the extent of the covered claims" in existence at designated times and within certain limits. Section 508(a)(2) provides that PCIGC shall "[b]e deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." Section 508(a)(4) authorizes PCIGC to pay "covered claims to the extent of [its] obligation and deny all other claims."

Section 509 requires that PCIGC submit to the Insurance Commissioner "a plan of operation ... necessary or suitable to assure the fair, reasonable, and equitable administration of the Corporation" which shall become effective upon the Insurance Commissioner's written approval. Section 510 sets forth certain duties and powers of the Insurance Com-

missioner vis-a-vis the PCIGC. These include certain notifications to PCIGC concerning the existence of insolvent insurers, authorizing the Commissioner to suspend or revoke certificates of authority to transact insurance in this State of any member insurer which fails to pay its required assessment, or otherwise fine the erring member within specified limits. This section also authorizes the Commissioner to reject the designation of any "servicing facility" utilized by the PCIGC "if he finds claims are being handled unsatisfactorily"; it further provides for judicial review of "[a]ny final action or order of the Commissioner under this subtitle."

Section 512(a) provides:

"Any person having a covered claim against an insurer, including surety, under any provision in an insurance policy or surety bond, other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his right under such policy or bond. Any amount payable on a covered claim under this subtitle shall be reduced by the amount of any recovery under such insurance policy or surety bond."

Section 514 provides that PCIGC shall "be subject to examination and regulation by the [Insurance] Commissioner." Finally, § 516 makes provision for recoupment of assessments paid by member insurers to PCIGC through rate and premium increases.[2]

---

**2.** PCIGC's statutory existence is traceable to ch. 703 of the Acts of 1971, which created its precursor, then known as the Maryland Insurance Guaranty Association (MIGA), a nonprofit, unincorporated legal entity created to aid claimants and policyholders of insolvent insurance companies. *See A.S. Abell Pub. Co. v. Mezzanote*, 297 Md. 26, 464 A.2d 1068 (1983). This act closely tracked the provisions of a model act proposed in 1969 by the National Association of Insurance Commissioners. The model act has served as a prototype for insurance guaranty associations in over forty states.

Chs. 161 and 440 of the Acts of 1986 made a number of changes in the 1971 Act. In particular, it changed MIGA's name to PCIGC, designated it as a private, nonprofit corporation, declared that it was not an agency or instrumentality of the State, and changed the method of selection of the Board of Directors.

## II

Upon PCIGC's refusal to comply with the Insurance Commissioner's order that it pay the claims in question, the Commissioner charged it with violating various provisions of the Insurance Code. A scheduled administrative hearing before the Commissioner was postponed when PCIGC filed a complaint for declaratory relief in the Circuit Court for Baltimore County in which it contended that the Commissioner lacked authority to require it to pay the PIP claims and that § 512(a) precluded it from paying the claims in any event. The circuit court (Levitz, J.) dismissed the complaint on August 11, 1986 without declaring the rights of the parties. It said that because insurance practices and policies were involved, the more appropriate forum for resolution of the case was a hearing before the Insurance Commissioner.

On August 25, 1986, an administrative hearing was held before the Insurance Commissioner. PCIGC maintained that under the provisions of subtitle 33 it possessed exclusive authority, independent of the Insurance Commissioner, over decisions concerning the payment of claims in the wake of an insurer insolvency. While recognizing that the Commissioner possessed express statutory authority with respect to some limited segments of its operations, PCIGC argued that he had no authority, express or implied, to insinuate himself in or substitute his judgment for that of the corporation in the matter of claim denials. PCIGC thus contended that its decision not to pay the PIP claims was wholly beyond the reach of the Commissioner's authority. It furthermore argued that it was the express purpose of § 512(a) to make up any shortfall that may exist after a claimant had exhausted all other avenues of recovery. Because the claimants had been paid for their damages well in excess of their PIP claims by solvent insurers of the negligent tort-feasors, PCIGC maintained that the claimants could not recover additional sums from it. PCIGC contended that its statutory purpose was not to place claimants in the same position that they would have occupied if an

insolvency had not occurred but rather to prevent out-of-pocket loss because of an insurer insolvency, *i.e.*, as set forth in § 504(a), to avoid financial loss to claimants or policyholders because of the insolvency of any insurer. It was the clear intention of § 512(a), according to PCIGC, to prevent duplicative recoveries for the same damages.

The Commissioner found that PCIGC had violated statutory duties imposed upon it under §§ 508(a) and 514 of the Insurance Code by not paying the PIP claims and that he was empowered to order PCIGC to pay the claims. As to PCIGC's position that § 512(a) precluded its payment of the claims, the Commissioner, in relating that section to the circumstances of this case, said that the claimants

"have no contractual *right* to file any claim against the tortfeasor's insurer under the provision in an insurance policy. Rather, the tortfeasor alone has a claim against his insurance company if his insurance company wrongfully refuses to pay in his place for his negligent action. It is clear that § 512 refers to contractual rights a claimant has under an insurance policy of his own, such as health or life insurance. It does not refer to civil tort rights of action which may ultimately be paid by some insurer as a result of another insurance policy, under which the claimant has no direct right of action. The Corporation may not require the instant claimants to exhaust a contract right which does not exist before the Corporation pays PIP benefits.

"This construction of § 512 is consistent with a correct interpretation of § 539 and § 540. It is clearly the legislative intent that PIP benefits be paid without respect to fault. The construction of § 512 advanced by the Corporation does offense to the clear intention of § 539 and § 540. It would result in a peculiar circumstance wherein insureds of insolvent insurance companies would receive PIP benefits only if the personal injury resulted from an action caused by themselves. Injuries caused by some other party would necessarily have to be recovered pursuant to an action brought against the alleged tortfeasor.

Moreover, § 540 provides that the payment of PIP benefits by an insurer shall not give that insurer a claim of recovery against any other person or insurer to recover any such benefits by reason of the alleged fault of such other person in causing or contributing to the accident. Therefore, the Corporation, which is nothing more than an association of all insurance companies, should not have a right that no single insurance company has under the PIP law." (Emphasis in original.)

The claimants, the Commissioner concluded, have a direct right to recover benefits only from insolvent insurers; the claimants have no direct right against any other insurer; and, consequently, "§ 512(a) requires claimants to exhaust first party contractual *rights* but not to exhaust third party *claims*." (Emphasis in original.) [3]

PCIGC appealed to the Circuit Court for Baltimore City, again asserting that the Commissioner was without authority to issue the order and that in any event he had incorrectly interpreted § 512(a). The circuit court (Caplan, J.), on April 13, 1987, agreeing with PCIGC, reversed the Commissioner's order. It found that the Commissioner had no legal authority to require PCIGC to pay claims and, moreover, that § 512(a) prohibited PCIGC from paying the claims. Upon the Commissioner's appeal, we granted certiorari prior to decision by the Court of Special Appeals to consider the important issues raised in the case.

### III

The Commissioner relies upon *A.S. Abell Pub. Co. v. Mezzanote*, 297 Md. 26, 464 A.2d 1068 (1983) to support his argument that he possesses regulatory authority to require PCIGC to pay the PIP claims here in issue. That case held that MIGA, PCIGC's predecessor, was a State agency for

---

**3.** Manifestly, a "first party claim" refers to the demand an insured may make on his or her own insurer pursuant to the terms of the insurance contract between them. A "third party claim" refers to the claim which a third party has against the insured tort-feasor.

the purpose of disclosures under Maryland's Public Information Act. Nothing in that case concerning the relationship between MIGA and the Insurance Commissioner, however, has any relevant bearing on the extent of the Commissioner's regulatory authority to require PCIGC to pay claims.[4] Of course, the fact that PCIGC is not a State agency does not mean that it is not subject to the Commissioner's authority. Indeed, the question is not whether PCIGC is a State agency but whether the legislature, in enacting the Insurance Code and subtitle 33 in particular, intended, subject to judicial review, to empower the Commissioner to order an insurance company, or an entity acting in place of an insurance company like PCIGC, to pay an entire class of disputed claims.

The general powers and duties of the Commissioner are set forth in § 24 of the Insurance Code, which in pertinent part provides:

"(1) The Commissioner shall enforce the provisions of this article, and shall execute the duties imposed upon him by this article.

(2) The Commissioner shall have the powers and authority expressly conferred upon him by or reasonably implied from the provisions of this article."

Nowhere in the Insurance Code is the power to order PCIGC to pay claims expressly conferred upon the Commissioner. In particular, § 510, which enumerates the duties and powers of the Commissioner with respect to PCIGC, contains no such express authorization.[5]

---

**4.** The Commissioner acknowledges that the 1986 amendments to subtitle 33 substantially altered the relationship between PCIGC and the State. *See* n. 2, *supra.*

**5.** Section 510 provides:
"(a) The Commissioner shall:
(1) Notify the Corporation of the existence of an insolvent insurer not later than 3 days after he received notice of the determination of the insolvency.

As earlier observed, § 508(a)(2) provides that PCIGC shall "[b]e deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." PCIGC, therefore, stands in the shoes of the insolvent insurer. It follows, we think, that if the Commissioner has authority to order an insurer to pay a claim, he retains this authority with respect to PCIGC claims when, because of the insurer's insolvency, it assumes the insurer's duties and obligations.

Under certain circumstances, the Commissioner does have authority to order an insurer to pay a claim. Section 55(2) provides that

"[t]he Commissioner may refuse to issue or after a hearing refuse to renew, or may revoke or suspend an insurer's certificate of authority, in addition to other grounds therefor in this article, if the insurer:

(i) Violates any provision of this article other than those as to which refusal, suspension or revocation is mandatory.

. . . .

(iv) Without just cause unreasonably refuses or delays payment to claimants of the amount due them."

Section 55A provides:

"In lieu of or in addition to revocation or suspension of an insurer's certificate of authority the Commissioner

---

(2) Upon request of the board of directors, provide the Corporation with a statement of the net direct written premiums of each member insurer.

(b) The Commissioner may:

(1) Require that the Corporation notify the insureds or the principal and specific obligees named in surety bonds, of the insolvent insurer and any other known interested parties of the determination of insolvency and of their rights under this subtitle. . . .

(2) Suspend or revoke, after notice and hearing, the certificate of authority to transact insurance in this State of any member insurer which fails to pay an assessment when due or fails to comply with the plan of operation. . . .

(3) Revoke the designation of any servicing facility if he finds claims are being handled unsatisfactorily."

may ... (2) require that restitution be made by such insurer to any person who has suffered financial injury or damage as a result of such violation."

Section 230A of the Insurance Code (the Unfair Trade Practices subtitle) in subsection (d) mandates:

"The following actions by an insurer ... if committed with such frequency as to indicate a general business practice, are unfair claim settlement practices and are violations of this section:

. . . .

(6) Failing to make a good faith attempt promptly, fairly, or equitably to settle claims for which liability has become reasonably clear."

Subsection (e)(2) states that the penalty for a violation of subsection (d) is as provided in §§ 12, 55, 55A, and 215.

In light of these provisions we think the trial court erred in its ruling that the Commissioner was not authorized to direct PCIGC to pay the claims involved in this case. To the contrary, §§ 55(2)(i) and 55A vested authority in the Commissioner to order an insurer to pay a claim if the insurer violates any provision of the Insurance Code; PCIGC under § 508(a)(2) stands in the stead of an insolvent insurer; it allegedly violated § 508(a) by failing to pay an entire class of covered claims; and it was therefore subject to the Commissioner's powers under §§ 55(2)(i) and 55A.

IV

█ The Commissioner next contends that the trial judge was wrong in holding that § 512(a) prohibited PCIGC from paying PIP claims in this case. This two-sentence section, as we have already noted, posits that any person "having a covered claim against an insurer ... under any provision in an insurance policy ..., other than a policy of an insolvent insurer which is also a covered claim, [must] exhaust first his right under such policy." The second sentence of § 512(a) provides that any amount payable "on a covered

claim ... shall be reduced by the amount of any recovery under such insurance policy."

Consistent with his decision in the administrative proceeding, the Commissioner points out that § 512(a) requires a claimant to "exhaust first his right under such policy." This right, he argues, is that of a first party claimant against a solvent insurer and not a third party claim against a tort-feasor insured under a policy of liability insurance. He says that the right to recover within the contemplation of § 512(a) is one which runs directly to the claimant under his own insurance policy; that a legal right to recover damages from a negligent tort-feasor, which may ultimately be paid by the tort-feasor's insurer, is not a right to which § 512(a) refers. The Commissioner points out that the claimants have no contractual right to file any claim against the tort-feasor's insurer under any provision in the tort-feasor's policy.

As we have stated countless times, our paramount aim in matters of statutory construction is to ascertain and effectuate the legislative intention, the primary source of which is the language of the statute itself. In this regard, we seek out the legislature's objective, goal, or purpose. *Kaczorowski v. City of Baltimore,* 309 Md. 505, 513, 525 A.2d 628 (1987). In doing so, we are not limited to the words of the statute but may consider other external manifestations or persuasive evidence, including related statutes, pertinent legislative history and other material, that fairly bears on the fundamental issue of legislative purpose or goal. *Id.* at 515, 525 A.2d 628.

In seeking the correct meaning of § 512(a), *Sands v. Pa. Ins. Guaranty Ass'n,* 283 Pa.Super. 217, 423 A.2d 1224 (1980) is instructive. In that case, the court construed the "non-duplication of recovery" provision in Pennsylvania's Insurance Guaranty Association Act, a provision nearly identical to § 512(a) of our own act. The court concluded that the wording in the Pennsylvania statute brought within its ambit first party claims under an uninsured motorist provision, but not third party claims against a tort-feasor

under a liability policy. The court reasoned that a party was only required to exhaust a claim against a solvent insurer if that claim is "also a covered claim," *i.e.,* the obligation of an insolvent insurer. The court noted that a claim brought against a solvent insurer under an uninsured motorist provision may be "also a covered claim" because it may also be the obligation of an insolvent insurer.[6] A third party claim brought against a tort-feasor insured by a solvent insurer under a liability policy, however, is not "also a covered claim" because it is not simultaneously an insolvent insurer's obligation. 423 A.2d at 1226–27.

This view is consistent with subtitle 33's stated purpose "to avoid financial loss" caused by an insurer's insolvency, for the legislative aim is to place claimants in the same position they would have occupied had the insurer not become insolvent. *See Sands,* 423 A.2d at 1228; *King v. Jordan,* 601 P.2d 273, 278 (Alaska 1979); *Prutzman v. Armstrong,* 90 Wash.2d 118, 579 P.2d 359, 362 (1978). Had not the insurers of the claimants in the present case become insolvent, the claimants would have been able to recover both PIP benefits from their own insurers and pursue third party tort claims against the tort-feasors. Hence, the recoveries of PIP benefits from PCIGC cannot be properly characterized as "windfalls."[7]

---

**6.** Since 1966 the insurance industry's Standard Uninsured Motorist Endorsement has included within the definition of the term "uninsured automobile" an automobile with respect to which there is a bodily injury liability insurance policy applicable at the time of the accident, but the company writing the policy has become insolvent. *See* National Bureau of Casualty Underwriters, 1966 Standard Form, Part V: Definitions ("Uninsured Highway Vehicle"); Ciano, *Uninsured Motorist Coverage, Company Insolvency, and the Ohio Insurance Guarantee Association Act,* 21 Clev.St.L.Rev. 65, 66–68 (1972).

**7.** PCIGC asserts that unfairness will result unless § 512(a) is interpreted to allow the set-off of a claimant's third party claim. Thus, it contends, when a tort victim's own insurer is insolvent and the tort-feasor's insurer is solvent, the tort victim could receive a double recovery (PIP from PCIGC and liability payments from the solvent insurer); when a tort victim's own insurer is solvent and the tort-feasor's insurer is insolvent, the tort victim could recover only the

There is another compelling reason why § 512(a) cannot be given the interpretation which PCIGC advocates. Subtitle 33, of which § 512(a) is a part, is not the only subtitle relevant to the present question; subtitle 35 (§§ 538–547A), which specifically provides for mandatory PIP coverage, must also be considered. Subtitles 33 and 35 derive from different acts and were passed at different times: subtitle 33 is based on ch. 703 of the Acts of 1971; subtitle 35 is based on ch. 73 of the Acts of 1972. These separate acts, of course, form part of a single insurance code and hence must be interpreted with reference to one another and harmonized to the extent reasonably possible. *Farmers & Merchants Bank v. Schlossberg,* 306 Md. 48, 56, 507 A.2d 172 (1986); *Bridges v. Nicely,* 304 Md. 1, 10, 497 A.2d 142 (1985); *Smelser v. Criterion Ins. Co.,* 293 Md. 384, 389, 444 A.2d 1024 (1982). In this regard, § 540 of subtitle 35 requires that PIP benefits be paid "without regard to the fault or nonfault of the named insured or the recipient in causing or contributing to the accident, and without regard to any collateral source of medical, hospital, or wage continuation benefits." Yet fault would to some degree become a factor in determining a party's entitlement to PIP benefits if, as PCIGC urges, the party must first exhaust a third party claim against the tort-feasor. For if the party were at fault, no third party claim would be successful and thus the injured party would be entitled to unreduced PIP benefits from PCIGC; if the party were not at fault, there could be a third party claim, and PIP payments would be eliminated or reduced accordingly. Moreover, reducing PIP payments by the amount of the third party claim would violate § 540's prohibition against consideration of any collateral source. Though this section's collateral source rule is mod-

---

liability payments from PCIGC reduced because of § 512(a) by the PIP payments from the solvent insurer. The assumption is that the tort victim in the latter example would be required by § 512(a) to reduce its liability recovery by the PIP payments from the solvent insurer. We express no opinion on the validity of this assumption because it does not undermine our conclusion. The legislative intent arguably includes both results.

ified by § 543(d), which requires that PIP benefits be reduced by amounts recovered under workmen's compensation laws, it is not modified with respect to third party claims. To the contrary, § 542 expressly preserves an injured party's right to pursue such a claim unaffected by any provisions in the subtitle.[8] It is thus apparent that the legislature did not intend to preclude a party from recovering PIP benefits in addition to a full tort recovery against the tort-feasor.

Finally, we note that one of subtitle 35's fundamental aims is the speedy provision of PIP benefits without the lengthy delays entailed by tort litigation. Such prompt payment is a basic purpose of no-fault insurance generally, see *Smelser v. Criterion Ins. Co., supra;* O'Connell, *The Insurance Industry and the Remedy of No–Fault Insurance,* 94–95 (1971). And, as we have pointed out before, the PIP statutory scheme rests on a no-fault basis. *Travelers Ins. Co. v. Benton,* 278 Md. 542, 545, 365 A.2d 1000 (1976). Moreover, § 544(a) makes evident that promptness is a chief aim of the statutory plan for it requires all PIP payments to be made within thirty days after proof supporting the PIP claim is received by the insurer. This accent on rapid payment cannot be reconciled with an interpretation of § 512(a) requiring an injured party to exhaust third party liability claims before recovering any PIP benefits from PCIGC. Pursuing such claims to completion could in many cases consume months or years, leaving the injured party in the interim without money to pay necessary medical and hospital bills. And this burden, anomalously, would fall only on injured parties who were not at fault for their injuries; parties clearly at fault would have no third party claim to exhaust that would suspend their rights to recover PIP benefits.

---

**8.** Section 542 provides:
"Nothing in this subtitle shall be deemed to affect the right of any person to claim and sue for damages or losses sustained by him as the result of a motor vehicle accident."

We conclude, therefore, that PCIGC was obligated to pay the PIP claims here at issue.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE ORDER OF THE INSURANCE COMMISSIONER; COSTS TO BE PAID BY THE APPELLEE.