David VAN GUILDER, an incompetent person, by Lee Van Guilder, his conservator, Appellant (A03–911), Respondent (A03–1408),

v.

NATIONAL FREIGHT, INC., et al., Respondents (A03–911), Appellants (A03–1408),

New Prime, Inc., et al., Respondents,

Success Leasing, Inc., Defendant.

Nos. A03–911, A03–1408.

Court of Appeals of Minnesota.

Sept. 14, 2004.

Charles A. Bird, Jeremy R. Stevens, Bird & Jacobsen, Rochester, MN, for appellant/respondent David Van Guilder.

Eric J. Magnuson, Diane B. Bratvold, Richard C. Scattergood, Rider Bennett, LLP, Minneapolis, MN and Jennifer K. Huelskoetter, Bowman and Brooke, LLP, Minneapolis, MN, for respondents/appellants National Freight, Inc., et al.

Mark A. Gwin, Andrea E. Reisbord, Cousineau, McGuire & Anderson, Minneapolis, MN, for respondents New Prime, Inc., et al.

Considered and decided by WRIGHT, Presiding Judge; RANDALL, Judge; and KALITOWSKI, Judge.

## OPINION

WRIGHT, Judge.

In these consolidated appeals, David Van Guilder's conservator asserts that he is entitled to judgment notwithstanding the verdict (JNOV) because the jury's award of past medical expenses is inadequate and the jury's determination that he was causally negligent is not supported by the record. National Freight challenges the district court's denial of its motion to reallocate the uncollectible portion of New Prime's equitable share of the judgment under Minn.Stat. § 604.02, subd. 2 (2002). As to Van Guilder's appeal, we reverse the denial of JNOV as to damages and affirm the denial as to fault. As to National Freight's appeal, we affirm the district court's reallocation decision.

## FACTS

On December 3, 1999, at approximately 5:30 a.m., in foggy conditions, a multiple-vehicle collision occurred on northbound Interstate 35, south of Owatonna. Shortly before the accident, Steven Whitehead, who was driving a tractor-trailer truck owned by National Freight (collectively National Freight), pulled onto the right shoulder of the northbound interstate to check his on-board computer for directions and to relieve himself. After doing so, he drove along the shoulder to get up to speed and then merged onto the right lane of the highway.

Charles Williams was driving New Prime's tractor-trailer truck (collectively New Prime) northbound on Interstate 35. The New Prime truck struck the National Freight truck from behind. Although the National Freight truck was able to pull ahead and stop on the right shoulder, the New Prime truck jackknifed and complete-ly blocked the northbound lanes of the freeway. A thick, slippery fluid accumulated on the road from the accident, and debris was scattered across the road.

John Kluver was driving a third tractor-trailer truck, also traveling northbound. As he approached the area, traveling at about 55 to 60 miles per hour, Kluver saw Van Guilder's car pass Kluver on the left and then "impact" the jackknifed truck. Kluver braked, and although his truck was sliding, he was able to pull over onto the right shoulder. Kluver next saw a second passenger vehicle (the Hamburg vehicle) and then a third passenger vehicle slide by. The Hamburg vehicle struck Van Guilder's driver's-side door. Van Guilder was seriously injured.

Van Guilder's conservator sued National Freight and its driver, Whitehead, and New Prime [1] and its driver, Williams. At trial, Van Guilder presented evidence that he suffered catastrophic injuries and incurred $293,908.21 in medical bills, plus additional expenses for home-care services. The jury determined that Whitehead, Williams, and Van Guilder were negligent in the operation of their respective vehicles, and that their negligence was a direct cause of the accident. The jury assessed the drivers' negligence as follows: National Freight truck driver Whitehead, 37.75 percent; New Prime truck driver Williams, 40 percent; and Van Guilder, 22.25 percent. Among other damages, the jury awarded $100,000 for past medical expenses. The district court denied post-trial motions and denied National Freight's motion for reallocation based on the insolvency of New Prime's insurer. These consolidated appeals followed.

---

1. After the accident, New Prime's insurer became insolvent, and the Minnesota Insurance Guaranty Association defended New Prime.

## ISSUES

I. Was Van Guilder entitled to JNOV regarding past medical expenses on the ground that the parties stipulated to them and past medical expenses were uncontroverted at trial?

II. Was Van Guilder entitled to JNOV on the jury's findings that he was partially negligent and that his negligence was a direct cause of the accident?

III. Under the Minnesota Insurance Guaranty Association Act, must National Freight, as a joint tortfeasor with a solvent insurer, exhaust its insurance coverage under Minn.Stat. § 60C.13, subd. 1 (2002), before the uncollectible portion is reallocated under Minn.Stat. § 604.02, subd. 2 (2002)?

## ANALYSIS

### I.

We "will sustain a jury verdict if it is possible to do so on any reasonable theory of the evidence." *Hughes v. Sinclair Mktg., Inc.*, 389 N.W.2d 194, 198 (Minn. 1986). Viewing the evidence in the light most favorable to the verdict, *Lesmeister v. Dilly*, 330 N.W.2d 95, 100 (Minn.1983), we "will set aside a jury verdict only if [it is] manifestly contrary to the evidence." *Hughes*, 389 N.W.2d at 198.

Evidence was presented as to two types of "medical expenses." First, there were past "medical bills" in the amount of $293,908.21 for services such as an ambulance, hospital bills, and other medical expenses. Second, there were expenses for past "home health-care services." The jury awarded $100,000 for past medical expenses, and Van Guilder moved for JNOV. In this motion, Van Guilder sought $293,908.21 for his past medical bills, which he asserts is the amount to which the parties stipulated, in addition to the $100,000 awarded by the jury, which he contends only represents past expenses for home health-care services.

The district court ruled that the parties had stipulated only to the foundation for the past medical bills, not that these medical bills were reasonable and necessary. In determining that there was sufficient evidence to support the jury's verdict of $100,000 for past medical expenses, the district court observed that the billing statements for the stipulated medical bills contained some notations as to insurance coverage and payments and that the evidence for the value of past home health-care services was not conclusive. Based on these findings, the district court denied the motion for JNOV.

Van Guilder first argues that the district court erred as a matter of law in ruling that "there was no specific stipulation by [respondents] that the medical expenses were reasonable and necessary." "In the interest of expediting the trial of lawsuits and reducing their costs, litigants are encouraged to stipulate to facts which are not in serious dispute." *Southdale Ctr., Inc. v. Lewis*, 260 Minn. 430, 434, 110 N.W.2d 857, 860 (1961). When parties stipulate to the facts, the parties and the courts are bound by the stipulation until it is abandoned. *Gethsemane Lutheran Church v. Zacho*, 253 Minn. 469, 479–80, 92 N.W.2d 905, 913 (1958). Whether the parties arrived at a stipulation is a question of fact, which we review for clear error. *See Anderson v. Anderson*, 303 Minn. 26, 31, 225 N.W.2d 837, 840 (1975). A dispute may arise as to whether a party stipulated only to foundation or whether the stipulation encompassed the causal connection, reasonableness, and necessity of the facts at issue. *See Flanagan v. Lindberg*, 404 N.W.2d 799, 800 (Minn.1987). When the parties stipulate only to foundation, a jury's award of damages that are less than

the stipulated amount is not inadequate as a matter of law. *Id.*

Although the parties may have initially stipulated at a pretrial hearing to the necessity, reasonableness, and causal connection of the medical bills in the amount of $293,908.21, they did not refer to this stipulation in later discussions with the district court. The bills for this amount were introduced into evidence with reference to a stipulation but without reference to its terms, and a witness briefly testified as to the necessity and reasonableness of the medical expenses. The district court was neither asked to instruct the jury as to this stipulation nor to insert this sum in the verdict form that was given to the jury. New Prime's counsel referred to the stipulation in closing arguments, but National Freight's counsel did not. After referring to the past medical expenses in the amount of $293,908.21, Van Guilder's counsel stated, "We've done the arithmetic for you." Van Guilder's counsel then asked the jury to add an unspecified amount for home health-care services. Van Guilder's counsel, however, did not expressly refer to a stipulation. On this record, we cannot conclude that the district court clearly erred in finding that there was no stipulation that extended to the necessity and reasonableness of the claimed medical expenses.

■ Van Guilder argues in the alternative that, even without a stipulation to the amount of past medical expenses, he was entitled to JNOV because the amount was uncontroverted at trial. In denying the motion, the district court concluded that the medical opinions were not "so positive as to exclude doubt," and that it was the jury's duty to consider and weigh the evidence. The district court observed that the billing statements contained notations to insurance coverage and payments, which Van Guilder could have, but did not,

delete. Accordingly, the district court held that Van Guilder failed to establish that the verdict was not justified by the evidence.

■ The amount of damages is a question of fact for the jury, which is entitled to wide deference as long as the amount found is "within the range of reasonable awards." *Pulkrabek v. Johnson,* 418 N.W.2d 514, 516 (Minn.App.1988), *review denied* (Minn. May 4, 1988). A jury is not bound to accept medical testimony. *Krueger v. Knutson,* 261 Minn. 144, 159, 111 N.W.2d 526, 536 (1961). Nonetheless, on this record, we cannot find that there was any disputed evidence as to the amount, reasonableness, or necessity of Van Guilder's past medical expenses. The handful of notations regarding insurance does not provide support for a rational decision to award only $100,000 and to ignore $193,908.21 in medical bills. In the absence of evidence controverting either the amount, reasonableness, or necessity, there was no dispute as to the damages for past medical expenses. Viewing the evidence in the light most favorable to the verdict, we hold that the verdict was manifestly contrary to the undisputed evidence. Accordingly, we reverse the district court's denial of JNOV for Van Guilder in the amount of $293,908.21 for past medical expenses.

## II.

■ Van Guilder next challenges the jury's determination that his negligence was a direct cause of the accident. The jury found the driver of the National Freight vehicle 37.75 percent negligent; the driver of the New Prime truck 40 percent negligent; and Van Guilder 22.25 percent negligent. The jury also found each driver's negligence to be a direct cause of the accident. The district court denied Van Guilder's motion for JNOV,

ruling that, when the facts were viewed in the light most favorable to the verdict, there was sufficient evidence to support the jury's findings.

■ Negligence generally presents a fact question for the jury. *Block v. Target Stores, Inc.*, 458 N.W.2d 705, 712 (Minn.App.1990), *review denied* (Minn. Sept. 28, 1990). We review the record to determine whether the jury verdict can be sustained on any reasonable theory of the evidence. *Hughes*, 389 N.W.2d at 198. In doing so, we view the evidence in the light most favorable to the prevailing party. *Lesmeister*, 330 N.W.2d at 100. "The testimony of a single witness may suffice as the basis for a verdict." *Canada by Landy v. McCarthy*, 567 N.W.2d 496, 504 (Minn. 1997).

Van Guilder challenges respondents' reliance on the testimony of a single eyewitness, truck driver Kluver, to establish Van Guilder's negligence. He contends that Kluver's testimony is not reliable because Kluver merely speculated that Van Guilder was in the car that passed him, Kluver incorrectly described the color of the vehicle that passed him, and Kluver incorrectly identified the Hamburg vehicle as the one that first struck the New Prime truck.

Kluver testified that Van Guilder passed him while Kluver was traveling 55 to 60 miles per hour. In addition, Kluver testified that he saw Van Guilder's car hit the New Prime truck. From this evidence, the jury reasonably could have believed that Van Guilder's speed was both too fast for the foggy conditions and unreasonable. Further, the jury could have drawn the reasonable inference that, if Kluver was able to avoid the collision and bring his 55,000–pound tractor double trailer to a complete stop, despite sliding, then Van Guilder would have been able to do the same had he not been negligent. Challenges to the appropriate weight and credi-

bility afforded Kluver's testimony were the jury's to resolve. When viewed in the light most favorable to the verdict, the record supports the jury's finding that Van Guilder drove negligently.

■ Next, Van Guilder contends that National Freight and New Prime failed to prove that his negligence was a direct cause of the accident. He suggests that his injuries were caused not by his collision with the jackknifed New Prime truck, but by the collision of the Hamburg vehicle with his car. Rather than arguing to the jury that the driver of the Hamburg vehicle was negligent, Van Guilder raised this claim for the first time at the JNOV hearing. Van Guilder also argues that it was the burden of National Freight and New Prime to prove which of these impacts was the source of his injuries.

■ "[I]n a multiple-impact situation, the burden of proving that the harm can be separated falls on [the party] who contend[s] that it can be apportioned." *Mathews v. Mills*, 288 Minn. 16, 22, 178 N.W.2d 841, 845 (1970). Whether a party's negligence was a proximate cause of plaintiff's injuries "is a question of fact for the jury." *McCarthy*, 567 N.W.2d at 506.

■ The jury was properly instructed that there can be more than one direct cause of an accident or harm and that this occurs if the effects of the negligence or fault of two or more persons occurred at about the same time and caused the accident or injury. 4 *Minnesota Practice*, CIVJIG 27.15 (1999). The question of proximate cause is a question for the jury, and our review of the record establishes that the jury's determination that Van Guilder's negligence was one of the causes of the accident is supported by the evidence.

### III.

The final issue is one of first impression concerning the construction and application of Minn.Stat. § 60C.13, subd. 1 (2002), the exhaustion-of-other-coverage provision of the Minnesota Insurance Guaranty Association (MIGA) Act, and its interplay with the joint-tortfeasor reallocation statute, Minn.Stat. § 604.02, subd. 2 (2002).

The jury awarded total damages of $2,350,000 and assessed fault as follows: Steve Whitehead (National Freight), 37.75 percent; Charles Williams (New Prime), 40 percent; and David Van Guilder, 22.25 percent. After reducing the verdict by Van Guilder's percentage of fault, the district court ordered judgment against defendants jointly and severally in the amount of $1,827,125. Based on the jury's allocation of fault, National Freight's equitable share of the judgment was $887,125, while New Prime's equitable share was $940,000.

At the time of the accident, New Prime was fully insured by Reliance Insurance Company. Reliance has since become insolvent, and MIGA has assumed Reliance's obligations in accordance with the MIGA Act, Minn.Stat. §§ 60C.01–.22. National Freight was fully insured by a solvent insurance company, and its insurance limits far exceed the total amount of the judgment. There is no assertion that Van Guilder had any applicable insurance.

National Freight moved for an order declaring MIGA responsible for $300,000 of the judgment, the maximum amount allowable under Minn.Stat. § 60C.09, subd. 3 (2002), based on the insolvency of New Prime's insurer. National Freight's motion also sought reallocation between National Freight and Van Guilder of the remaining uncollectible portion of New Prime's equitable share ($940,000–$300,000=$640,000), pursuant to Minn.Stat. § 604.02, subd. 2. The district court ruled that, pursuant to section 60C.13, subdivision 2, National Freight must exhaust its insurance before MIGA is required to provide coverage. Because National Freight's insurance coverage far exceeded its liability, the district court ruled that MIGA is not responsible for any payment and that National Freight must pay any amount that New Prime is unable to pay due to the insolvency of New Prime's insurer.

Statutory construction presents a question of law, which we review de novo. *Hibbing Educ. Ass'n v. Pub. Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn. 1985). Words and phrases are construed "according to their common and approved usage." Minn.Stat. § 645.08(1) (2002). When ambiguous, the intent of the legislature may be ascertained by considering factors such as the occasion, necessity, and objectives of the law. Minn.Stat. § 645.16 (2002). If two provisions conflict and are irreconcilable, the special provision shall be construed as an exception and shall prevail over the general provision. Minn. Stat. § 645.26, subd. 1 (2002).

We first consider the MIGA Act, Minn. Stat. §§ 60C.01–.22. Many states in the early 1970s addressed the increasing problems caused by insolvent insurance companies by enacting insurance guaranty association acts. Paul G. Roberts, *Insurance Company Insolvencies and Insurance Guaranty Funds: A Look at the Nonduplication of Recovery Clause*, 74 Iowa L.Rev. 927, 933–34 (1989). These acts often were based on a model act prepared by the National Association of Insurance Commissioners. *See Post–Assessment Prop. & Liab. Ins. Guar. Assoc. Model Act, reprinted in* 3 *NAIC Model Laws, Regulations & Guidelines* 540–41 (1997); Roberts, *supra*, at 933–34 & n. 73. In 1971, Minnesota enacted the MIGA Act, creating MIGA, an organization of all in-

surers authorized to transact insurance business within the state. 1971 Minn. Laws ch. 145, §§ 1–20.

■ A stated purpose of the MIGA Act is to protect Minnesota insureds and claimants against financial loss because of the liquidation of an insurer:

> The purposes of this chapter are to provide a mechanism for the payment of covered claims under certain insurance policies and surety bonds, to the extent provided in this chapter, minimize excessive delay in payment and *to avoid financial loss to claimants or policy holders because of the liquidation of an insurer,* and to provide an association to assess the cost of the protection among the insurers.

Minn.Stat. § 60C.02, subd. 2 (2002) (emphasis added). "Thus, MIGA was created to ensure that third-party claimants ... are compensated for covered claims and that policyholders ... do not suffer financial loss due to the insolvency of their insurer." *Unique Sys. Dev., Inc. v. Star Agency,* 500 N.W.2d 144, 147 (Minn.App. 1993), *review denied* (Minn. July 15, 1993). The chapter is to be "liberally construed" to effect these purposes. Minn.Stat. § 60C.02, subd. 3 (2002).

MIGA is funded by assessments levied on the member insurers in proportion to each insurer's net direct written premiums, the cost of which is passed on directly to policyholders. Minn.Stat. §§ 60C.06, subd. 1, .18, subd. 1 (2002). From this fund, "covered claims" are paid by MIGA. Minn.Stat. § 60C.05, subd. 1(a) (2002). A covered claim is "any unpaid claim ... which arises out of and is within the coverage of an insurance policy issued by a member insurer if the insurer becomes insolvent." Minn.Stat. § 60C.09, subd. 1(a)(1) (2000). MIGA pays a maximum of $300,000 per covered claim. *Id.,* subd. 3 (2000).

Because New Prime's insurer would have provided coverage for New Prime's $940,000 judgment, and because the insurer is now insolvent, it is a "covered claim." *Id.,* subd. 1(a)(1). The party insured by the insolvent insurer is not liable for any portion of a claim that constitutes the difference between the $300,000 MIGA liability cap and the liability limit of the insolvent insurer's policy. *Minn. Mining & Mfg. Co. v. H & W Motor Express Co.,* 507 N.W.2d 622, 624 (Minn.App.1993), *review denied* (Minn. Dec. 22, 1993). Here, because New Prime was fully insured for the extent of its liability ($940,000), New Prime is not responsible for paying that judgment, even though New Prime's insurer became insolvent.

■ At issue is the MIGA Act's exhaustion-of-other-coverage provision, which provides:

> *Any person having a claim under another policy* whether or not the policy is a policy of a member insurer, which claim arises out of the same facts which give rise to the covered claim, *shall first be required to exhaust the person's right under the other policy.* Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under such insurance policy. For purposes of this subdivision, another insurance policy does not include a workers' compensation policy.

Minn.Stat. § 60C.13, subd. 1 (emphasis added). National Freight first argues that the exhaustion provision does not apply to it as a matter of law. It contends that the statutory language providing that "[a]ny person having a claim under another policy ... shall first be required to exhaust *the person's right* under the other policy," Minn.Stat. § 60C.13, subd. 1 (emphasis added), contemplates only first-person coverage because a "person" has no direct

"right" to proceed against another person's insurer in Minnesota. *See Cincinnati Ins. Co. v. Franck,* 621 N.W.2d 270, 274 (Minn. App.2001) (stating "Minnesota does not have a direct-action statute that allows an injured plaintiff to proceed directly against an insurer"). Instead, the injured party must first obtain a judgment from the insured. *Morris v. Am. Family Mut. Ins. Co.,* 386 N.W.2d 233, 237 (Minn.1986). Consequently, National Freight argues that, because it is not a first-party insurer, the exhaustion requirement does not apply to it.

National Freight cites a Maryland case, which it asserts has discussed this interpretation favorably under a similar statutory framework. *Ins. Comm'r of Md. v. Prop. & Cas. Ins. Guar. Corp.,* 313 Md. 518, 546 A.2d 458, 460, 465 (1988). The provision at issue stated: "Any person having a covered claim against an insurer ... shall be required to exhaust first his right under such policy." Md.Code Ann., Ins. § 512(a) (1986). The Maryland Supreme Court commented favorably on the insurance commissioner's argument that this right was "that of a first party claimant against a solvent insurer and not a third party claim against a tort-feasor insured under a policy of liability insurance." *Ins. Comm'r,* 546 A.2d at 463; *see also Sands v. Pa. Ins. Guar. Assoc.,* 283 Pa.Super. 217, 423 A.2d 1224, 1226–27 (1980), *cited favorably in Ins. Comm'r,* 546 A.2d at 463–64.

Minnesota's exhaustion provision once had language similar to that of the Maryland statute. The earlier exhaustion provision stated:

> Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insurer in liquidation *which is also a covered claim,* is required to exhaust first any right under the other policy.

Any amount payable on a covered claim ... shall be reduced by the amount of any recovery under such insurance policy.

Minn.Stat. § 60C.13, subd. 1 (1990) (emphasis added). We addressed this earlier provision when we analyzed the policy of the insured of an insolvent insurer and held that the insured could choose whether to pursue underinsured or uninsured coverage. *Wondra v. Am. Family Ins. Group,* 432 N.W.2d 455, 459 (Minn.App. 1988), *review denied* (Minn. Jan. 25, 1989), *overruled on other grounds, Garrick v. Northland Ins. Co.,* 469 N.W.2d 709 (Minn. 1991). We further determined that, if the insured pursued the underinsured coverage, it was not deductible from the MIGA obligation "because it is in excess of the tortfeasor's coverage and is not, therefore, a 'covered claim' under section 60C.13." *Id.* In 1991, the legislature amended section 60C.13, subdivision 1, eliminating the "also a covered claim" language. 1991 Minn. Laws ch. 325, art. 6, § 8. The statute now provides instead:

> Any person having a claim under another policy whether or not the policy is a policy of a member insurer, which claim arises out of the same facts which give rise to the covered claim, shall be first required to exhaust the person's right under the other policy.

Minn.Stat. § 60C.13, subd. 1 (2002).

New Prime argues that, before 1991, the analysis of section 60C.13, subdivision 1, focused on whether the claim against the insurer was also a "covered claim." But the focus after the 1991 amendment is on whether the "claim arises out of the same set of facts which give rise to the covered claim." *Id.* We agree. Consequently, as National Freight acknowledges in its reply brief, the opinions from other jurisdictions are factually distinguishable and not particularly helpful.

 .The plain language of the MIGA Act does not limit the exhaustion requirement to only first-person coverage. Rather, it broadly applies to "[a]ny person having a claim under another policy . . . which claim arises out of the same facts which give rise to the covered claim." *Id.* An interpretation of the exhaustion provision that adopts the limitation urged by National Freight would thwart the MIGA Act's express purpose of protecting both "claimants" *and* "policy holders" against financial loss because of the insolvency of an insurer.[2] The legislature was capable of explicitly limiting the exhaustion requirement to first-party insurers had it chosen to do so. In the context of the definition of covered claims, the legislature has specified various types of claims that are not covered.[3] Minn.Stat. § 60C.09, subd. 2. In the absence of express legislative intent, we decline to impose limits under the MIGA Act that are contrary to its stated purpose. MIGA "was created to ensure that *third-party claimants* . . . are compensated for covered claims," as well as that policyholders are "protected from financial loss due to the insolvency of their insurer." *Unique Sys.*, 500 N.W.2d at 147 (emphasis added).

National Freight also maintains that its interpretation meets the MIGA Act's cost-spreading purpose pursuant to Minn.Stat. § 60C.05, subd. 1, which would be compromised if we interpret the exhaustion provision so as to require one insurer to bear the entire judgment. We find this argument unpersuasive. The legislature has expressed a preference that the burden of an insolvent insurer will not be borne by the victim or the insured. As noted by the district court, because of the nature of the association, the legislature has taken affirmative steps to limit MIGA's exposure for any one claim by specifying the types of claims covered by the MIGA Act and by limiting the amount that can be paid on any one claim. Minn.Stat. § 60C.09, subd. 2(2); *Unique Sys.*, 500 N.W.2d at 147; *Anderson Trucking Serv., Inc. v. Minn. Ins. Guar. Ass'n*, 492 N.W.2d 281, 283 (Minn.App.1992), *review granted* (Minn. Jan. 22, 1993) *and appeal dismissed* (Minn. Mar. 30, 1993). The stated purposes of the MIGA Act, however, do not include protection of solvent insurers. And the statutes governing MIGA cannot be interpreted to do so.

Similarly unpersuasive is National Freight's argument that, if the exhaustion

---

2. That an injured party has no direct right of coverage from the tortfeasor's insurer is based on an analysis of the contractual relationship between the insured and the insurer that is inapposite to our interpretation of the MIGA Act. *State Farm Mut. Auto. Ins. Co. v. Tenn. Farmers Mut. Ins. Co.*, 645 N.W.2d 169, 173–74 (Minn.App.2002), *review denied* (Minn. Aug. 20, 2002). The exhaustion requirement, as applied here, does not contemplate a direct action by an injured plaintiff against an insurer. As a result of the jury's verdict, Van Guilder has a judgment against two insureds—New Prime, whose insurer is insolvent, and National Freight, whose insurer is solvent. The MIGA Act merely provides a mechanism for covering the insolvent insurer's obligation with safeguards, such as the exhaustion requirement and the $300,000 cap, to preserve the financial viability of the association. Moreover, limiting the exhaus-

tion requirement to first-party coverage would protect policyholders but not claimants, thereby rendering one aspect of the Act's purposes unfulfilled.

3. These include, for example, claims due to a reinsurer or an insurer and claims for subrogation recovery, reinsurance recovery, contribution, or indemnification. Minn.Stat. § 60C.09, subd. 2(2); *see In re Liquidation of Nat'l Family Ins. Corp.*, 603 N.W.2d 668, 670 (Minn.App.1999) (noting that insurers' subrogation claims not covered claims under MIGA, Minn.Stat. § 60C.09, subd. 2). In addition, any first-party claim by an insured whose net worth exceeds $25,000,000 at the end of the year prior to the year in which the insurer becomes solvent is not covered. Minn.Stat. § 60C.09, subd. 2(3).

requirement is construed to apply to the insurance coverage of other tortfeasors, MIGA loses its incentive to mount a vigorous defense whenever another insured tortfeasor is involved. Indeed, MIGA's incentive is not compromised because the insured remains liable for all damages in excess of the liability limits. Here, in its representation of New Prime, MIGA successfully limited New Prime's share of the verdict to just 40 percent.

Finally, we consider whether the exhaustion provision under Minn.Stat. § 60C.13 or the reallocation provision under Minn.Stat. § 604.02, subd. 2, is applied first. Under the joint-liability statute, when parties are jointly liable, they are generally jointly and severally liable for the entire award. Minn.Stat. § 604.02, subd. 1 (2002). Nonetheless, if one party's equitable obligation is uncollectible, another party may move for reallocation within one year of the judgment. *Id.,* subd. 2. In that circumstance, the district court "shall determine whether all or part of a party's equitable share of the obligation is uncollectible from that party and shall reallocate any uncollectible amount among the other parties, including a claimant at fault, according to their respective percentages of fault." *Id.; Hosley v. Armstrong Cork Co.,* 383 N.W.2d 289, 292–93 (Minn.1986); *see also Gregor v. Clark,* 560 N.W.2d 744, 745 (Minn.App.1997) (holding that "a court must reallocate all uncollectible obligations among tortfeasors who can pay").

The canons of statutory construction answer this question. If a general provision and a special provision conflict and are "irreconcilable, the special provision shall prevail and shall be construed as an exception to the general provision." Minn.Stat. § 645.26, subd. 1 (2002). An exception to this rule occurs if the general provision was enacted at a later session and the legislature manifestly intended that the general provision should prevail. *Id.*

First, we conclude that the provision for reallocation is general, applying whenever a party's share of the judgment is uncollectible. *See* Minn.Stat. § 604.02, subd. 2. In contrast, the MIGA Act is specific, applying only to the particular case of insurer insolvency. *See* Minn.Stat. § 60C.02, subd. 2. Although the MIGA Act was enacted in 1971 and the reallocation statute was enacted in 1978, there is no manifest indication that the legislature intended the reallocation statute to prevail. 1971 Minn. Laws ch. 145; 1978 Minn. Laws ch. 738. Indeed, section 60C.13 was most recently amended in 1997, making it the provision last addressed by the legislature. 1997 Minn. Laws ch. 52, § 9. As the more specific statute, the MIGA Act, Minn.Stat. § 60C.13, prevails. *See* Minn.Stat. § 645.26, subd. 1. Accordingly, we conclude, as the district court did, that, because New Prime's equitable share is exhausted under National Freight's policy, nothing remains to be reallocated.

## DECISION

We affirm the district court's denial of JNOV on the jury's findings as to Van Guilder's negligence. As to the district court's denial of JNOV for medical expenses, we reverse and hold that Van Guilder is entitled to judgment including past medical expenses of $293,908.21. The exhaustion provision of the MIGA Act, Minn.Stat. § 60C.13 (2002), shall be applied before the reallocation statute, Minn. Stat. § 604.02, subd. 2 (2002), is applied. Thus, National Freight must exhaust its insurance coverage before funds may be recovered from MIGA. Accordingly, we also affirm this aspect of the district court's ruling.

**Affirmed in part and reversed in part.**